UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | . | |
| United States of America, | . | Docket #CV-22-709 (MSG) |
| | . | |
| Plaintiff, | . | |
| | . | United States Courthouse |
| vs. | . | Philadelphia, PA |
| | . | June 2, 2022 |
| Unified Judicial System of | . | 10:00 a.m. |
| the Commonwealth of | . | |
| Pennsylvania, | . | |
| | . | |
| Defendant. | . | |

.............................................................

TRANSCRIPT OF ORAL ARGUMENT HEARING
BEFORE THE HONORABLE MITCHELL S. GOLDBERG
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:                David W. Knight, Esq.
                                  Civil Rights Division
                                  Disability Rights Section
                                  USAO Program Coordinator
                                  950 Pennsylvania Ave.-NW-4-CON
                                  Washington, DC 20530

                                  Adam F. Lewis, Esq.
                                  DOJ-CRT
                                  Civil Rights Division
                                  4 Constitution Square
                                  150 M. Street, NE
                                  Washington, DC 20530

For The Defendant:                Geri Romanello St. Joseph, Esq.
                                  Administrative Office of
                                  Pennsylvania Courts
                                  1515 Market St.-Ste. 1414
                                  Philadelphia, PA 19102

```
                                    Robert J. Krandel, Esq.
                                    Administrative Office of
                                    Pennsylvania Courts
                                    1515 Market St.-Ste. 1414
                                    Philadelphia, PA 19102

Audio Operator                      J. Cruz

Transcribing Firm:                  Writer's Cramp, Inc.
                                    1027 Betty Lane
                                    Ewing, NJ 08628
                                    609-588-8043
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK:  All rise.  The United States District

2 Court for the Eastern District of Pennsylvania is now in

3 session.  The Honorable Mitchell S. Goldberg presiding.

4    THE COURT:  Good morning.  Good morning.  Have a

5 seat.

6    MS. ST. JOSEPH:  Good morning, Your Honor.

7    THE COURT:  Good morning.  I'll never tire hating to

8 ask this question.  Anyone in the courtroom not fully

9 vaccinated?

10    UNIDENTIFIED SPEAKER:  No, Your Honor.

11    THE COURT:  Okay.  All right.  This is _United States_

12 _v. United Judicial System of Pennsylvania_.  Who are the

13 lawyers for plaintiff?

14    MR. KNIGHT:  Your Honor, David Knight for the United

15 States.  I'm joined by Adam Lewis, and we have a paralegal,

16 Ana Young, as well.

17    THE COURT:  Hi.  Lewis, Knight, Lewis, Young.

18 Right?  Did I get that right?  And for defendant?

19    MS. ST. JOSEPH:  Geri St. Joseph for the Unified

20 Judicial System, along with --

21    THE COURT:  St. Joseph?

22    MS. ST. JOSEPH:  St. Joseph.  Along with my

23 colleague, Robert Krandel.

24    THE COURT:  Spell your last name.

25    MR. KRANDEL:  K-R-A-N-D-E-L.

1              THE COURT:  Okay.  Okay.  So just a preliminary

2    matter.  We set up a -- I don't know, three, four years ago,

3    maybe longer, we concluded that we were being unnecessarily --

4    and this case doesn't apply to this.  So we concluded we were

5    being unnecessarily inundated with 12(b) motions, and that's a

6    (indiscern.) this case, right?  And this is -- what's the

7    (indiscern.) number of this case?

8              MR. CRUZ:  22-709.

9              THE COURT:  Okay.  So this doesn't apply to this

10   case.  But we set up a system whereby before 12(b)s could be

11   filed by a defendant, they were required to submit a short

12   letter in laying things out, and then the plaintiff would

13   respond.  And it was really more for cases just by way of

14   example.  Simple example where it's a breach of contract case

15   and a plaintiff would file a negligence action, which clearly

16   wasn't allowed.  Or a situation where a plaintiff would file a

17   very lean Iqbal Twombly complaint on, again, I'll use the

18   example breach of contract, and the defendant would file a

19   reflexive 12(b) motion that really wasn't going to go anywhere

20   because the complaint wasn't plausible under Iqbal and

21   Twombly.

22        And what we did was, so we require a letter to be filed,

23   and then a response, and we get the lawyers on the phone and

24   we could say, well, what do you think?  We try to work things

25   out and it's worked.  It's really worked.  We've reduced the

1   number of opinions we have to write on 12(b) and I think

2   reduce the amount of time we spend on 12(b), which is really

3   just an analysis of a complaint, and a pretty low bar.

4       So this case is more legal based.  So while you're here,

5   as I started to get prepared for this, I thought well maybe

6   that process doesn't really apply to this case.  So we're

7   going to -- you're going to file your -- let me see who's who.

8   You're going to file -- thank you.  You're the state.  You're

9   the Department of Justice.

10          MR. KNIGHT:  Yes.

11          THE COURT:  You're going to file your 12(b) motion,

12   and whatever the rules say, you know, the time to respond,

13   you're going to respond.  And, you know, if you need more

14   time, fine.  And is your motion ready or how much time -- do

15   you want some time to file it?

16          MS. ST. JOSEPH:  Your Honor, we're relatively ready

17   to go.

18          THE COURT:  All right.  No worries.

19          MS. ST. JOSEPH:  We could certainly have it filed by

20   next week.

21          THE COURT:  No worries.  So -- how about if I give

22   you ten days, okay?

23          MS. ST. JOSEPH:  Thank you.

24          THE COURT:  And whatever the -- you want to give me

25   -- suggest a time for your response?

1          MR. KNIGHT:  Recognizing the rules are 14, if we
2     could ask for 21 just to --
3          THE COURT:  All right.
4          MR. KNIGHT:  -- sufficiently respond.
5          THE COURT:  And then while we're here, we can use
6     this time now as an oral argument.  Okay?  So I have some
7     questions and then if there's more that you feel that you need
8     to say that hasn't been addressed through answering my
9     questions, then I'll give you the chance to do that.
10         So in no particular order, I am asking the Department of
11    Justice, and it may be laid out in the complaint, how many
12    counties are you alleging violated the disability
13    (indiscern.)?
14         MR. KNIGHT:  So, Your Honor, in the -- is it okay if
15    I stay here, or do you want me to approach?
16         THE COURT:  You can stay there.
17         MR. KNIGHT:  Okay.  So in the complaint, as of now,
18    we have alleged eight specific counties that have violated the
19    ADA.
20         THE COURT:  Okay.
21         MR. KNIGHT:  Three --
22         THE COURT:  And --
23         MR. KNIGHT:  Two counties that are also with
24    complainants listed, Complainant A, B, and C, but then six
25    additional counties are listed with specific issues or

1    violations.

2              THE COURT:  So can you delineate when you say -- two

3    with -- you said two with actual complaints?

4              MR. KNIGHT:  So in Jefferson County, there are two

5    named complainants.

6              THE COURT:  Right.

7              MR. KNIGHT:  Complainant A and Complainant B.  In

8    Northumberland County, there's Complainant C.  But those are

9    just the individuals we named.  We're seeking relief for

10   anyone harmed by the actions across the system.  So we have

11   identified policies in Allegheny, Blair, Butler, Clinton,

12   Delaware, and York.  And we expect through fact discovery to

13   identify additional victims, individuals who are under court

14   supervision across the system, and who are in treatment for

15   their disability who have been denied or limited in their

16   access to their important physician prescribed medication.  So

17   we expect the relief to be broader.

18             THE COURT:  Okay.  As to the six, and let's -- try

19   to keep your answers to -- you know, confined to what's in the

20   complaint.  And you can refer me to paragraphs if you want.

21   The one thing I didn't get to do is re-review the complaint.

22   That's a pretty lean complaint.  So I'll certainly do that,

23   you know, before making any ruling.  But of the six, are you

24   alleging that these are policies implemented by the state

25   courts across the board?  In other words, I'll use, you know,

1   in our court, we have a relapse prevention court.  So why

2   don't we use the -- I know in state court, they use the term

3   drug court.  That's (indiscern.).  I know that Judge

4   Strawbridge who presides over our relapse prevention court, he

5   hates the term drug court.  But we use it because it's just

6   simpler to say.

7        In the -- of the six, were the policies that you alleged

8   were discriminatory, were they implemented by an individual

9   judge, or were they implemented by the present judge of the

10  court, or how were the implemented?  And tel; me what it says

11  in your complaint.

12          MR. KNIGHT:  Okay.  So I mean if I could give an

13  example at paragraph 54 --

14          THE COURT:  Sure.

15          MR. KNIGHT:  -- Blair County.  Blair County has a

16  policy court-wide that's in writing that limits the use of

17  medication only to Vivitrol, which is one of three medications

18  for opiate use disorder, but it's not appropriate for all

19  individuals.

20          THE COURT:  Who signed that order?

21          MR. KNIGHT:  The policies, as we understand them,

22  are unsigned.  They're available on the court's websites.

23  They're just stated and laid out, but they're not in a signed

24  order by the judge.  Usually, they're in a manual or other

25  type of document that explains what one should expect when

1     going before that court.

2               THE COURT:  And are they -- is the manual for drug

3     court or is it for any case that's -- where someone is

4     arrested in that county?

5               MR. KNIGHT:  In the case of Blair County, it's for

6     their treatment courts.

7               THE COURT:  For their treatment court?

8               MR. KNIGHT:  Correct.

9               THE COURT:  And so you're telling me for that county

10    and the other six, it's just information available on the

11    website, and so you don't know whether -- like my experience,

12    and it's been a while since I've practiced in state court.

13    But my experience is there's one judge who oversees the drug

14    court.  So do you know or have you pled that it was a judicial

15    decision by the one judge who presides over the drug court, or

16    was it just an overall policy?  Does your complaint delineate

17    that?

18              MR. KNIGHT:  Our complaint for Blair County alleges

19    that their court prohibits participants in the treatment court

20    programs from using these medications.

21              THE COURT:  So not --

22              MR. KNIGHT:  So we haven't state this --

23              THE COURT:  -- not a court order.

24              MR. KNIGHT:  Correct.

25              THE COURT:  A policy.

1            MR. KNIGHT:  Correct.

2            THE COURT:  Okay.  For sake of discussion, if it

3    were an order by the judge who -- what was the county you

4    said?  Blair?

5            MR. KNIGHT:  Blair.

6            THE COURT:  The judge who -- what was the county you

7    said?  Blair?

8            MR. KNIGHT:  Blair.

9            THE COURT:  Just using Blair as an example.  It's a

10   hypothetical.  If it turned out that the edict -- what was the

11   drug you mentioned?

12           MR. KNIGHT:  So Vivitrol is allowed --

13           THE COURT:  They can only use what?

14           MR. KNIGHT:  Vivitrol.

15           THE COURT:  Vivitrol.  Okay.

16           MR. KNIGHT:  But not Methadone or Buprenorphine.

17           THE COURT:  If hypothetically --

18        (Court confers with Clerk)

19           THE COURT:  If the drug that -- drug -- the judge

20   that oversaw the drug court issued a judicial order regarding

21   the only Vivitrol, would you -- would that be problematic for

22   you under the Genesee case?

23           MR. KNIGHT:  No, because -- and how so, Your Honor.

24   So the Genesee case was -- or the Mr. Genesee v.

25   Administrative Office of Pennsylvania Courts was ultimately

1    dismissed by the Third Circuit because the Administrative

2    office of Pennsylvania Courts does not have a program to serve

3    as their activity under Title 2 of the ADA that Mr. Genesee

4    was denied access to.

5            THE COURT:  Well, yeah, but it also says, and I'll

6    read it.  Because judicial decision making is not a services,

7    AOPC provides to either disabled or non-disabled individuals,

8    Genesee, who's not excluded from the service based on his

9    disability, and I read that to say -- and tell me if I'm

10   reading it wrong, if it's judicial decision making, they have

11   immunity.  Do you agree or disagree?

12           MR. KNIGHT:  So we disagree.  The judicial immunity

13   would apply to individual judicial decision making in a case,

14   for example, on the merits.  But when there's a court-wide

15   edict by a judge, such as what happened in Jefferson County

16   where they banned all medications, that is within the reach of

17   the ADA and Title 2.

18           THE COURT:  So then why -- if you concede that you

19   can't bring a lawsuit regarding individual judicial decision

20   making, which I think I heard you say.  I'm not trying to box

21   you in.

22           MR. KNIGHT:  Yeah.  Yeah.

23           THE COURT:  Yeah.  Then why are there two individual

24   -- why did you bring lawsuits on behalf of two individuals?

25           MR. KNIGHT:  Why did we?

1        THE COURT:  Did you.  Why did you?  Yes.  Weren't

2   they prevented from taking prescription medications vis a vis

3   an individual judge's decision?

4        MR. KNIGHT:  So in Jefferson County, the two

5   individuals were denied based on a policy --

6        THE COURT:  A policy?

7        MR. KNIGHT:  -- implemented by the judge in the form

8   of an order, but a policy that wasn't applied just to them or

9   wasn't based on the merits of their case.  The judge was all

10  individuals in this court within 30 days must be off these

11  medications.

12       THE COURT:  What was the reason -- let's go back to

13  Blair and the -- is it --

14       MR. KNIGHT:  Vivitrol.

15       THE COURT:  Vivitrol.

16       MR. KNIGHT:  Yes.

17       THE COURT:  What was the reason, and you're telling

18  me that you don't know how this came about.  It's just a

19  policy.  But do you know why that Blair County has set forth

20  this edict?

21       MR. KNIGHT:  I mean, having worked in this area for

22  some time, there is a history of prejudice and stigmatized

23  belief around medication.  As you saw from what the judge

24  ordered in Jefferson County, and we included it in the

25  complaint, there is this belief that it is trading one drug

1    for another, and that you're not {quote}{unquote} "clean"

2    unless you're off medication entirely.  So it's a, you know,

3    rejection of the science, which is that an individual can take

4    these opioid-based treatments --

5            THE COURT:  Are you speculating as to that, or do

6    you know --

7            MR. KNIGHT:  Certainly, we -- no, we required --

8            THE COURT:  -- that that's the basis --

9            MR. KNIGHT:  No, we require fact --

10           THE COURT:  -- that the judges in Blair -- let me

11   get my question out.

12           MR. KNIGHT:  Yeah.

13           THE COURT:  Do you -- are you saying we think that's

14   the basis that judges just don't -- in Blair County, that

15   court just, to use your word, have a prejudice?  Or is there

16   any basis for their decision that you've come across?  Which

17   is it?

18           MR. KNIGHT:  Your Honor, it is absolutely

19   speculation I was entertaining for you.  But the point of our

20   complaint and fact discovery will be to determine the reason

21   behind that decision, and to bring forward the argument by the

22   United States that blanket policies blocking disability-based

23   medication is inappropriate under the ADA.

24           THE COURT:  But if it's speculation, you certainly

25   know that you can't bring a complaint that's deficient and

1   then say let us go forward.  We'll find the evidence to backup

2   what we're saying, right?  You agree with that premise, right?

3          MR. KNIGHT:  I do agree, sir.  Yes.

4          THE COURT:  Okay.  So how do you know?  It could be,

5   just for sake of, you know, interesting discussion, it could

6   be that Blair County, to use them as an example said, we don't

7   want anyone taking any type of opioid prevention addiction

8   drug because it's got to cultured or something like that.

9          MR. KNIGHT:  Sure.

10          THE COURT:  It could be that.  But it could be that

11   that county did something else and relied upon extensive

12   expert advice that maybe you disagree with, but they were

13   principled in relying on it.  So leading to the question of if

14   you don't know, how does your complaint survive?

15          MR. KNIGHT:  So even a principled decision, Your

16   Honor, is -- does not prevent someone from exposure under

17   Title 2 of the ADA.  So denying access to medication based on

18   a disability violates the ADA, regardless of the good

19   intentions of the individual or the entity that is alleged to

20   have violated the ADA.

21          THE COURT:  How's -- I've got to challenge you on

22   that one because -- not a doctor, not an expert, but we

23   (indiscern.), our court as an example, and I'll give you two

24   examples, as a sentencing judge who has to provide

25   rehabilitation services to persons under my supervised

1    release, I often -- quite often defer to probation.  And when

2    I have someone who has a drug problem, probation has

3    specialists -- probation officers who are specially trained in

4    drug addiction, opioid addiction, and also have access to all

5    kinds of resources.

6         And I can assure you that there are instances where I

7    defer to them, drug and alcohol treatment at the discretion of

8    probation, and they determine that opioid addiction medication

9    is not appropriate.  Have I violated the Disabilities Act?

10   Has probation and our court violated the Disabilities Act?

11        MR. KNIGHT:  No.  Your Honor, what you've done there

12   is exactly what the ADA expects, which is an individualized

13   assessment based on the individual person, their disability,

14   and the situation.  But what the ADA does not allow is a

15   blanket banning of treatment for individuals with disabilities

16   across the system with no individualized assessment.

17        THE COURT:  Okay.  So I'm just repeating back what I

18   heard you say, which you said very clearly.  You're concerned

19   -- the Department of Justice's concern is the blanket banning

20   and according to you, it doesn't matter what the reason is if

21   it's a blanket ban, then it's discriminatory.

22        MR. KNIGHT:  Correct.

23        THE COURT:  And if your discovery determines that

24   Blair County, to use them as an example, had a principled

25   reason for the blanket ban that you disagree with, do you

1    still have a cause of action?

2         MR. KNIGHT:  If the principled reason is incorrect

3    or based on misinformation or wrong science, then we believe

4    we still have a cause of action.

5         THE COURT:  Well, science -- I mean, you know.  We

6    all know, you can get qualified doctors to say it's black and

7    the other one could say it's white, right?

8         MR. KNIGHT:  Sure.

9         THE COURT:  So suppose Blair County relied on

10   persons who were qualified for their blanket ban, that your

11   experts disagreed with, but you couldn't say, well, these

12   persons are unqualified under Daubert.  So there's a

13   difference of opinion amongst medical experts.

14        MR. KNIGHT:  Sure.

15        THE COURT:  Violation of the ADA?

16        MR. KNIGHT:  I mean, we would allege it's a

17   violation of the ADA.  And I assume that would need to go to a

18   fact finder then to determine which expert should have been

19   trusted or followed.

20        THE COURT:  Okay.  That makes sense.  That's fair.

21   And you're alleging -- your complaint alleges that all eight

22   of the counties have a blanket ban?

23        MR. KNIGHT:  Have or had in some form or another.

24   So I don't want to say it's a blanket ban.  And often times, a

25   policy can be in the form of action.  So for example, there's

1   no written policy in Northumberland County, but we have

2   alleged that a policy was applied to Complainant's C, and that

3   likely was applied to other individuals under court

4   supervision in Northumberland as well.

5       But we don't have a clear cut, written policy in every

6   county.

7           THE COURT:  Do you have any instances in any of the

8   eight counties where decisions were made on individual

9   defendants by individual judges?

10          MR. KNIGHT:  Your Honor, I think the closest thing

11  to that would be Northumberland County in Complainant's C.

12  But as we alleged, as we learned from the various individuals

13  involved in Complainant C's treatment, it was understood that

14  the staff of the treatment court knew that individuals were

15  not allowed to continue on this medication to graduate.  And

16  so it was the expectation that she would need to get off of

17  the medication before she could graduate from drug court.

18          THE COURT:  Does the Department of Justice concede

19  if the case goes forward that discovery -- if discovery

20  determines that the edict against the addiction drugs,

21  whatever they were, was made on an individual basis to an

22  individual defendant by an individual judge, do you concede

23  that's not (indiscern.)?

24          MR. KNIGHT:  So I'm going to put it slightly

25  differently.  I still would allege that an edict would violate

1    the ADA, but if an individual in a drug court had showed a

2    history of diversion of drugs, that individual has no right to

3    continue on that medication if there's an individual based

4    reason the judge has told that individual they can no longer

5    take this treatment because of past bad behavior, other

6    information that they're bringing into the consideration.

7              THE COURT:  Not conceding -- next question -- is

8    probably not a 12(b) appropriate question, but just curious.

9              MR. KNIGHT:  Okay.

10             THE COURT:  Have you gone to these eight counties?

11   Has the Department of Justice gone to these eight counties and

12   said this is problematic, can you make it more individualized

13   and not across the board?

14             MR. KNIGHT:  So this -- I mean, it's a little bit.

15   So the letters, which is that -- have we done --

16             THE COURT:  A little bit of what?  I'm sorry.

17             MR. KNIGHT:  It's a little -- to the letters that

18   the parties filed.  The condition precedent before we were

19   able to file this suit was attempt to reach voluntary

20   compliance with the Unified Judicial System.  We sent a letter

21   of finding to them, as required by our regulations.  We asked

22   them to come to us and have a discussion about how to resolve

23   this.  The Unified Judicial System in their letter that they

24   cite did not agree to injunctive relief.  And so while they're

25   open to hearing information from the Department of Justice,

1  they weren't willing to reach the compliance that we needed.

2  So we have brought suit instead.

3      But we were willing to discuss resolution short of

4  litigation.  We also asked for a tolling agreement to allow us

5  time to negotiated, and that was denied.  So we're here, but

6  we are totally open to negotiating with --

7          THE COURT:  Yeah.  I was just curious as to whether

8  you presented to them what you wanted.  And your requested

9  relief is you want me to order the eight counties to change

10  their procedures?  Or you want me to order the entire

11  Pennsylvania judiciary to implement something or both?

12          MR. KNIGHT:  The second, Your Honor.  We believe

13  it's a unified system and that these eight counties are

14  exemplar of potentially problematic policies elsewhere.  And

15  we'd like the unified system, which is the appropriate entity,

16  to do so to direct appropriate policies across the system so

17  that individuals have access to their treatment.

18          THE COURT:  And I assume based on our discussion

19  that procedure that you want me to order would include clear

20  language that individual judges can deviate from the policy

21  based on an individual analysis.  Do you agree?

22          MR. KNIGHT:  That would be completely fine.  Yes.

23          THE COURT:  Okay.  Okay.  All right.  Well, we

24  talked about a lot, so I'll let -- I'm sure you have a lot of

25  responses.  So I'll just let you talk.  Go ahead.

1          MS. ST. JOSEPH:  Your Honor, so I think the first

2     thing is just this whole systemic -- you know, the -- it's

3     eight counties identified in the complaint.

4          THE COURT:  How many counties, again --

5          MS. ST. JOSEPH:  There are 67 counties in

6     Pennsylvania, 60 judicial districts.  Several of them are

7     joint counties.  They have two counties for one judicial

8     district.  So we've identified -- they've identified eight.

9     Jefferson County they sent a letter in, and that was it.

10    Northumberland, they actually -- you know, but when they sent

11    those letters initially back in 2018 to Jefferson and 2020 to

12    Northumberland County, the Department of Justice that is, they

13    sent them to the president judges of those counties.  They did

14    not send them to us, to the Unified Judicial System.  The

15    first --

16         THE COURT:  Well, they can correct that.

17         MS. ST. JOSEPH:  They --

18         THE COURT:  They sent you a letter.  It's called a

19    complaint.

20         MS. ST. JOSEPH:  Right.  They did.  And so there's -

21    - and then they've -- in the complaint, they allege these

22    other six counties.  It was in their letter of February.  They

23    gave us a letter in February and gave us a week to respond to

24    it.  And when -- we took a little bit longer because, you

25    know, we needed a little bit more time to respond.  We did say

1    we'd be happy to have a conversation.  But we weren't going to

2    enter a consent decree, and we weren't going to enter into a

3    tolling agreement.  But --

4            THE COURT:  So you know, I have zero problem with

5    you doing either.  That's your prerogative.  You're the lawyer

6    for the defendant and I mean, I think it's a fascinating case.

7    If it doesn't settle, that's great with me.  I mean, so I'm

8    not faulting you in any way for not being more amenable to

9    discussions.  No problem.  Do what you want.  You're the

10    lawyer.

11            MS. ST. JOSEPH:  The -- but our issue here, and it

12    is something we have discussed many times with counsel for the

13    Department of Justice, that Pennsylvania, while it is --

14    constitutionally says it's a unified judicial system, the

15    individual judicial districts are funded locally by the

16    individual counties.  And the president judges of those

17    individual judicial districts make decisions with treatment

18    court -- with their treatment court teams on these issues.

19        These policies are not handed down from the top down.

20    There's not one policy for every treatment court across

21    Pennsylvania.  And that's the relief they seem to be seeking

22    here.  It's like -- it's a fundamental misunderstanding by the

23    United States of how Pennsylvania Courts really function.  It

24    really is individual in each judicial district.  It's not

25    broad as they're seeking.

1           THE COURT:  Yeah.  So like by way of example to make

2    sure I understand it, I think I have this right.  Congress

3    appropriates in the federal system money for the judiciary and

4    the Office of Administrative Courts appropriates the money to

5    the different circuits, and it funnels down to the different

6    districts.  You're saying the state system is different in

7    that the funding is appropriated from the county in which the

8    court sits.

9           MS. ST. JOSEPH:  Correct.  They are --

10          THE COURT:  And that makes a difference because

11   what?

12          MS. ST. JOSEPH:  Well, it's not truly centralized

13   the way other judicial districts -- other states do have.

14   Like New Jersey, for example, as a truly centralized system

15   from top down, and they have policies that are statewide.

16   Pennsylvania is not like that.  It's kind of a hybrid, where

17   it is a system, but that UJS covers not only the courts, it's

18   all the board, the rules committees, the boards, you know, the

19   Judicial Conduct Board, the administrative office.

20          THE COURT:  So suppose I would find -- suppose I

21   would say complaint dismissed because the AOPC doesn't fund

22   the counties that are allegedly engaged in the discriminatory

23   conduct, okay?  Because that seems like that's where you're

24   going.  They're going to say -- I don't want to speak for the

25   Department of Justice, but they could say fine, let us amend

1    and we're going to sue each individual -- all the eight

2    individual counties.  So then where does that get us?

3              MS. ST. JOSEPH:  Then we go into eight different

4    lawsuits, and we can talk about eight individual policies

5    within those individual districts.  But --

6              THE COURT:  Hold that thought for a second.  What do

7    you think about that?

8              MR. KNIGHT:  So just looking at the letter they

9    filed with you and quoting, the UJS leaders have also

10   implemented extensive measures designed to infuse the

11   Commonwealth's judicial system with safeguards to the rights

12   of people with disabilities.  So they do concede that they

13   have the ability to disseminate policies that say do not

14   violate the ADA.

15       We're asking for those policies to go one step further

16   and explain that if someone's taking disability based

17   medication for opioid use disorder, that should be allowed

18   other -- except for an individualized assessment.

19             THE COURT:  But suppose I find that the president

20   judge of Blair County, because he doesn't get his or her

21   funding from the defendant in this case doesn't have to

22   implement what you want me to implement?  I mean, then where

23   are we?  Suppose the present judge says thank you for that

24   guidance, AOPC, but I don't report to you on how I run my

25   courtrooms.  So I'm not doing it.  Then what?

1           MR. KNIGHT:  And we haven't sued the AOPC.  We've

2     sued the Unified Judicial System, which is a named entity in

3     the Pennsylvania Constitution and can hold its component

4     courts accountable.  We would be fine, as you suggested, to

5     amend our --

6           THE COURT:  What's the difference between the two

7     entities?  I'm not getting that nuance.

8           MR. KNIGHT:  The --

9           THE COURT:  The AOPC is the Administrative Office of

10    Courts, and you sued, I thought, them?  No?

11          MR. KNIGHT:  Unified Judicial System.  A different

12    named entity in the -- it's the name for the judiciary for

13    Pennsylvania.  It's synonymous with the Commonwealth, except

14    the Commonwealth is the entire state executive branch.  We've

15    sued the judicial branch.

16          THE COURT:  Explain to me why that entity can tell a

17    president judge how to run their courts.

18          MR. KNIGHT:  I believe because the way the

19    Pennsylvania Constitution is structured, the Unified Judicial

20    System is led by the Supreme Court of Pennsylvania.  So if the

21    Supreme Court of Pennsylvania would like to direct judges to

22    not violate the ADA, we would presume that the Supreme Court

23    had that authority.  And that the opposite, if they do violate

24    the ADA, that the Unified Judicial System could be held to

25    account for it.

1          In the same way that in <u>Giordano</u> that we mentioned, an

2     individual who was bringing a former employee of the Superior

3     Court was terminated and brought as suit based on his

4     termination against the Unified Judicial System and the

5     Superior Court, the Unified Judicial System was held to

6     account at least for the Title 7 claim for the actions of that

7     one component court.

8          And then separately, the ADA claim went ahead against

9     just the head of the Unified Judicial System in his individual

10    -- or in his official capacity for an Eleventh Amendment

11    immunity work around.

12             THE COURT:  And your position is <u>Janess</u> is it?

13             MS. ST. JOSEPH:  <u>Janess</u>.

14             MR. KNIGHT:  <u>Janess</u>.

15             MS. ST. JOSEPH:  <u>Janess</u>.

16             THE COURT:  Case.  <u>Janess</u>.  <u>Janess</u> case, the

17    Department of Justice's position is <u>Janess</u> doesn't apply here

18    because that involved an individual defendant, and this

19    involves across the board policy, right?

20             MR. KNIGHT:  <u>Janess</u> doesn't apply because it was

21    dismissed in that it was a suit against the AOPC, a different

22    entity.  An entity that is a part of the unified system, but

23    not the entity that did the program service or activity Mr.

24    <u>Janess</u> was seeking that is individual criminal court

25    decisions, or the bringing of his trial.

1          THE COURT:  Was -- if <u>Janess</u> was brought against the
2     Unified Judicial System, you think it -- the Third Circuit
3     should have kept the case going?
4          MR. KNIGHT:  Speculating.  But I think the case
5     could have gone forward against the Unified Judicial System.
6          THE COURT:  But it involves an individual who was
7     subject to individual judges' order or inaction.  And I
8     thought your position was in that case, we don't have -- we're
9     not going to meddle.
10         MR. KNIGHT:  I believe in that case, it wasn't the
11    denial or it wasn't a decision by a judge, it was the failure
12    of the judicial system to bring the trial that he was
13    requesting.
14         THE COURT:  Right.  But the acts -- the omissions
15    were not omissions by the Unified Judicial System or the AOPC.
16    They were omissions by judges.
17         MR. KNIGHT:  Okay.  I'll concede that.
18         THE COURT:  Right?  Okay.
19         MR. KNIGHT:  And --
20         THE COURT:  So how's -- so then what's the different
21    -- suing the different entity have to do --
22         MR. KNIGHT:  So the program service or activity that
23    the Unified Judicial System here provides to probationers is
24    supervision under probation and drug treatment court programs.
25    That is a Title 2 program in the way that -- in the <u>Janess</u>

1    case, AOPC could not provide the program that he was seeking,
2    which was a trial.

3           THE COURT:  So back to you.  Go ahead.

4           MS. ST. JOSEPH:  The program or activity is at the
5    judicial district level.  It is -- the Supreme Court of
6    Pennsylvania does not supervise probationers.  The individual
7    judges and probation officers in the judicial districts -- out
8    in the 60 judicial districts are the ones who supervise.
9    They're the sentencing judges making decisions.  Should they
10   be on probation?  Should they be offered a treatment court
11   program instead of probation?

12          THE COURT:  (Indiscern.).

13          MS. ST. JOSEPH:  Sorry, Your Honor.

14          THE COURT:  That's okay.

15          MS. ST. JOSEPH:  So it's down in the judicial
16   district level.  It's not done at -- these decisions, these
17   policies are not made up here.  They're made at the individual
18   judicial district.  And every judicial district has its own
19   set of policies, procedures, practices, and judges making --

20          THE COURT:  Well, how did these come about?

21          MS. ST. JOSEPH:  -- decisions.

22          THE COURT:  I mean, the Department of Justice is --
23   what I'm hearing is they're saying we're not really sure how
24   they came about.  We went on their websites and here they are.
25   Like how did they come about?

1             MS. ST. JOSEPH:  The --

2             THE COURT:  Was it -- did the PJ decide?  Did the

3     Board of Judges decide?  Did the head of the drug court

4     decide?

5             MS. ST. JOSEPH:  It depends on each judicial

6     district.  It's very fact specific to the judicial district.

7     There's often a treatment court.  If it's a treatment court in

8     particular, it will be, you know, a team of people, including

9     medical providers, some of whom do not allow or prohibit, as

10    was the case in Northumberland, do not allow an MAT for OUD in

11    the county, so the provider that was being used was a problem.

12            It's not just one decision by one person, but it is still

13    the sentencing court judge who's making, you know, the --

14    you're going to probation; you're going to drug court.  But

15    it's down at that judicial level.  It's not being made more

16    globally from, you know, a higher position.

17            THE COURT:  If you know, in the counties that have

18    across the board you can't use these drugs policies, can the

19    sentencing judge override that policy?

20            MS. ST. JOSEPH:  Sure.

21            THE COURT:  Yes?

22            MS. ST. JOSEPH:  Absolutely.  And we don't believe

23    there's any courts that are still prohibiting it.  So I know

24    it says have or has, but our -- we believe discovery will show

25    that that is not the case anymore.

1                    THE COURT:  That what's not the case?

2                    MS. ST. JOSEPH:  That there's no courts prohibiting

3        MAT currently.  That there's no -- and, in fact, they haven't

4        pled that.

5                    THE COURT:  The courts prohibiting what?

6                    MS. ST. JOSEPH:  Prohibiting the medically assisted

7        treatment, the Suboxone or --

8                    THE COURT:  I was looking for M --

9                    MS. ST. JOSEPH:  MAT.

10                    THE COURT:  MAT.  Okay.  Have you provided the

11       Department of Justice the information to substantiate what you

12       just said?

13                    MS. ST. JOSEPH:  Yes, Your Honor, we have over the

14       course of a year we provided them with this information.  When

15       they requested it, we did a survey.  We provided them with

16       information.

17                    THE COURT:  So they're saying you have policies

18       eight counties that prohibit in some fashion MATs.  You say no

19       we don't.  Here's the proof.  You've given it to them, and

20       they're still proceeding with that -- is that true? Have they?

21                    MR. KNIGHT:  They have provided what they would

22       argue is proof.  We disagree.  But even if it -- we were to

23       agree.

24                    THE COURT:  What do you disagree with?

25                    MR. KNIGHT:  We don't believe that the counties have

1    all stopped the ban.  So for example, the president judge from

2    Blair County at the time of our lawsuit told the press, this

3    is beyond the pleadings, but that they were looking to revise

4    their policies.  So they had not yet done it.  The same thing

5    that the UJS told us when we asked them a year ago.

6         But voluntary cessation aside, we would like affirmative

7    policies down from the Unified Judicial System ensuring that

8    affirmatively, courts are complying with their obligation.

9    And we think that's allowed.  Article 5, Section 10 of the

10   Pennsylvania Constitution gives the Supreme Court general

11   supervisory and administrative authority over all the courts

12   in Pennsylvania.  And they had done just that by directing

13   them to comply with Title 2 generally, just not specifically

14   in this situation.

15             THE COURT:  So if the Department of Justice becomes

16   satisfied that the eight counties that are a part of the

17   lawsuit are no longer prohibiting MATs, you're going to press

18   your cause of relief because you want me to order courts to

19   comply with the law?

20             MR. KNIGHT:  I think we'd like more information

21   about what that cessation involved.  Revoking a policy that

22   banned something is not the same as replacing it.

23             THE COURT:  Well, step back from this for a second.

24             MR. KNIGHT:  Yeah.

25             THE COURT:  Your -- look, judges, kings, queens,

1    senators, anyone with a -- I shouldn't have put judges and

2    kings and queens in the same sentence.  Anyone with the

3    authority that judges have have to comply with the ADA, of

4    course.  Everyone has to comply with the ADA, but I don't

5    know.  I'm just thinking out loud at this point, which I

6    probably shouldn't do.  But if you get to the point where

7    you're satisfied that these eight counties are now compliant,

8    the query whether you -- we're way beyond the 12(b) argument -

9    - the query whether you want to insist on having a federal

10   judge tell every county in the Commonwealth of Pennsylvania

11   that they must comply with the ADA.  That's --

12           MR. KNIGHT:  That's fair.

13           THE COURT:  That's a decision you guys -- the

14   Department of Justice will make.  It's not my decision.  I'm

15   just thinking out loud.  Okay.  What other arguments do you

16   want to tell me about?

17           MS. ST. JOSEPH:  I don't believe I have anything

18   else, other than -- you know, the rest will be covered in our

19   motion.

20           THE COURT:  Okay.

21           MS. ST. JOSEPH:  I would note there's, you know, a

22   statute of limitations argument for the individual

23   Complainants.

24           THE COURT:  Yeah.  I saw those.  I think we can

25   cover those (indiscern.).  Okay.  Okay.  Anything else that

1    the Department of Justice wants to say?

2              MR. KNIGHT:  No, Your Honor.  Thank you for your

3    time.

4              THE COURT:  Okay.  Yeah, sure.  Thank you.  All

5    right.  So we have time table for the submissions and I'll

6    just -- we'll just go forward.  Okay.

7              MS. ST. JOSEPH:  Thank you, Your Honor.

8              THE COURT:  Let's go off the record.

9         (Court adjourned)

10

11                          CERTIFICATION
12   I, Lewis Parham, certify that the foregoing is a correct
13   transcript from the electronic sound recording of the
14   proceedings in the above-entitled matter.
15

16
17   _Lewis Parham_                        6/6/22
18

19   _____     _____
20   Signature of Transcriber                Date