**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | |
| | : | No.  22-cv-00709 |
| v. | : | |
| | : | |
| THE UNIFIED JUDICIAL SYSTEM | : | |
| OF PENNSYLVANIA, | : | |
| | : | |
| *Defendant* | : | |

**UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA'S MOTION TO DISMISS THE
UNITED STATES OF AMERICA'S COMPLAINT**

Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, the Pennsylvania Unified

Judicial System (the "UJS" or "Defendant"), through its undersigned counsel, respectfully submits

this motion to dismiss the above-captioned complaint filed by the United States of America (the

"United States" or "Plaintiff").  For the reasons more fully set forth in the accompanying Brief

which is fully incorporated herein by reference, the complaint should be dismissed.

Respectfully submitted,

**/s/Robert J. Krandel**
ROBERT J. KRANDEL
Attorney I.D. No. PA89485
GERI R. ST. JOSEPH
Attorney I.D. No. PA84902
Supreme Court of Pennsylvania
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
legaldepartment@pacourts.us
(215) 560-6300, Fax: (215) 560-5486

***Counsel for Defendant Unified Judicial
System***

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | |
| | : | No.  22-cv-00709 |
| v. | : | |
| | : | |
| THE UNIFIED JUDICIAL SYSTEM | : | |
| OF PENNSYLVANIA, | : | |
| | : | |
| *Defendant* | : | |


**BRIEF OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA IN SUPPORT OF
ITS MOTION TO DISMISS THE UNITED STATES OF AMERICA'S COMPLAINT**

The Pennsylvania Unified Judicial System (the "UJS" or "Defendant"), through its undersigned counsel, respectfully submits this brief in support of its motion to dismiss the above-captioned complaint filed by the United States of America (the "United States" or "Plaintiff"), which seeks to hold to account, and enjoin, Pennsylvania's entire judicial system based primarily on a few alleged, closed-ended infractions by local courts years ago.  For the reasons more fully set forth herein, the complaint should be dismissed.

## I.     INTRODUCTION

This case arises under Title II of the Americans with Disabilities Act.[1]  Consistent with this remedial federal enactment, Defendant UJS maintains a policy – prescribed in Pennsylvania's Rules of Judicial Administration and applicable to courts throughout the state – "prohibit[ing] discrimination against any individual with a disability, as defined by [the ADA]."  Pa.R.J.A. 250; *see also id.* Pa.R.J.A. 251 ("These rules shall apply to each UJS entity.").  As discussed below,

---

[1] The Americans with Disabilities Act of 1990, Pub. L. 101-336, §§ 202-205, 104 Stat. 327, 337-53 (1990) (codified as amended in scattered sections of Title 42 of the U.S. Code) ("Title II of the ADA" or "Title II").

UJS leaders have also implemented extensive measures designed to infuse the Commonwealth's judicial system with safeguards for the rights of individuals with disabilities to enjoy equal access to the judicial system.

Ignoring this, the United States has filed a complaint against the entire state court system premised on the core allegation that two of Pennsylvania's sixty judicial districts violated Title II of the ADA during the judicial supervision of three criminal offenders, in that these individuals were prohibited from using medication-assisted treatment ("MAT") to treat opioid use disorder ("OUD") within very brief time periods.  The United States further attempts to buttress its approach by citing outdated policies from six additional judicial districts.  Yet, these past isolated incidents in a total of eight out of sixty judicial districts only establish the exact opposite of a systemic, statewide problem.  Even assuming the United States could establish these past isolated incidents, the remedy it seeks is particularly inappropriate because statewide court leaders both remind county courts that they are required to comply with the governing federal law and provide ample support, education and training – including a certification program for treatment courts – to aid local courts in satisfying their own essential obligations. The UJS simply is not an organizational entity that can or should be held accountable for the supervision of criminal offenders by judges at the local level.  Compounding its legal insufficiency, the misdirected strategy pursued by the United States in this matter also implicates strong federalism concerns.

Additionally, Plaintiff lacks standing; the complaint omits a necessary averment; and two of the three claimed violations are stale and out of time.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Consistent with the governing review principles, and solely for purposes of the underlying motion to dismiss, Defendant recites the Plaintiff's allegations from the Complaint.

On August 3, 2018, the Court of Common Pleas of Jefferson County issued an administrative order prohibiting persons under court supervision suffering from OUD from benefiting from MAT.  OUD is a form of drug addiction, a physical and mental impairment, and a recognized disability under the ADA.  MAT encompasses the use of medications approved by the federal Food and Drug Administration to treat OUD, including methadone, naltrexone and buprenorphine.  MAT can be an effective treatment for OUD, treatment may need to be prolonged, and arbitrary limits on duration are inadvisable.  *See* Complaint at ¶¶9-24.

The county court's order remained in place for over four and one-half months.  While it was in place, it caused harm to individuals under court supervision, including two persons suffering from OUD designated as Complainants A and B.  *See id.* at ¶¶16-17.

Similarly, a person suffering from OUD participating in the Northumberland County Drug Court program, administered by the Northumberland County Court of Common Pleas, was harmed by decisions of a Treatment Court Team, consisting of representatives of Northumberland County's Adult Probation and Drug & Alcohol Departments and a representative from a private provider of treatment services.  This person – known as Complainant C – was informed that, to continue to advance in the program, she was required to cease taking prescribed medication in the MAT line.  Complainant C was sent to in-patient and out-patient treatment facilities, and her progress through successive phases of the drug-court program was impeded.  After experiencing mental and physical distress and symptomology, she was permitted to graduate after spending four years in what typically is a less-than-two-year program.  *See id.* ¶¶39-50.

Although there are no other identified complainants, Plaintiff has offered some anecdotal evidence that six other Pennsylvania county courts "have *or had*" policies that "prohibit or otherwise limit" MAT for individuals in treatment-court programs.  *Id.* ¶51 (emphasis added).

According to Plaintiff, some of these policies explicitly ban specific forms of OUD medication, and others are inconsistent in how they address OUD medication and its use.  *Id.* ¶52.

On February 24, 2022, based on the foregoing, Plaintiff commenced a civil action naming Pennsylvania's Unified Judicial System as the defendant and alleging discrimination-based violations of Title II of the ADA and its implementing regulation, namely, 28 C.F.R. Part 35. Without identifying any supportive legal theory, in the sole count of the complaint, the United States claims that the entire UJS is liable for the "acts and omissions of its *component courts*."  *Id.* at ¶61 (emphasis added).  This bare pronouncement that Defendant is liable for infractions by component courts serves as the essential linchpin to Plaintiff's claims.

## III.    ISSUES

**A.    WHERE THE TEXT OF TITLE II OF THE ADA PROVIDES ENFORCEMENT AUTHORITY SOLELY TO "ANY PERSON" ALLEGING DISCRIMINATION ON THE BASIS OF A DISABILITY, DOES THE UNITED STATES – WHICH IS NOT A PERSON – HAVE STANDING TO PURSUE THOSE REMEDIES?**

> **Suggested answer:  No**

**B.    IS PENNSYLVANIA'S ENTIRE STATE COURT SYSTEM LIABLE FOR ADA VIOLATIONS OCCURRING AT THE LOCAL LEVEL, OR IN OTHER WORDS, IS PLAINTIFF'S COMPONENT-COURTS THEORY A VIABLE ONE?**

> **Suggested answer:  No**

**C.    HAS THE UNITED STATES FAILED TO PLEAD, AS REQUIRED, THAT COMPLIANCE CANNOT BE SECURED BY VOLUNTARY MEANS?**

> **Suggested answer:  Yes**

**D.    ARE THE CLAIMS PREMISED ON THE 2018 ADMINISTRATIVE ORDER OF THE COURT OF COMMON PLEAS OF JEFFERSON COUNTY UNTIMELY?**

> **Suggested answer:  Yes**

## IV.   GOVERNING REVIEW PRINCIPLES

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted, thereby challenging the sufficiency of the complaint's factual allegations to support the claim for relief.  *See, e.g.*, *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In this context, the Court must accept these factual averments as true and construe the complaint in the light most favorable to the plaintiff.  *See, e.g.*, *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).  *See generally Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (discussing the essential review paradigm in terms of assessing the *plausibility* of the claim for relief relative to the well-pleaded factual allegations (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009))).

In making this determination, the Court generally considers "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.  A complaint should be dismissed where the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) ("A complaint has to 'show' such an entitlement with its facts.").

## V.   ARGUMENT

### A.   PLAINTIFF LACKS STANDING TO PURSUE CLAIMS AGAINST STATE PUBLIC ENTITIES UNDER TITLE II, BECAUSE THE UNITED STATES IS NOT A PERSON.

By way of essential background, Title II is commonly referred to as "the public services portion of the ADA." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 (1999).  Section 202

5

of the remedial scheme prohibits a public entity from denying equal services to individuals or discriminating against them because of their disabilities. *See* 42 U.S.C. § 12132 (providing that, subject to the provisions of the subchapter, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"). Title II defines the term "public entity" primarily as encompassing state and local governments, as well as their agencies and instrumentalities. *See* 42 U.S.C. § 12131.

Most significant for purposes of Plaintiff's standing, the enforcement provision of Title II – namely, Section 203 – specifies that the remedies, procedures and rights of the subchapter are provided "to any *person* alleging discrimination on the basis of disability." 42 U.S.C. § 12133 (emphasis added). Since the sovereign is not a person, *Return Mail, Inc. v. USPS*, 587 U.S. ___, 139 S. Ct. 1853, 1861-62 (2019), the United States lacks enforcement power.

This plain-meaning interpretation of Section 203 is reinforced by Congress's approach of explicitly empowering the Attorney General of the United States to enforce Titles I and III of the ADA. *See, e.g.*, 42 U.S.C. § 12117(a) (prescribing, for Title I purposes, that the rights, procedures and remedies under this distinct subchapter are provided "to the Attorney General, *or* to any person alleging discrimination on the basis of disability") (emphasis added); *accord id.* § 12188(b)(1)(B) (reflecting a similar allocation of enforcement authority to the Attorney General pertaining to Title III). But, as reflected above, there is no such reference to enforcement authority on the part of the federal government in Title II. And it is well settled that, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. U.S.*, 464 U.S. 16, 23 (1983) (citation omitted).

The foregoing analysis mirrors the dissenting position in *United States v. Florida*, 938 F.3d 1221, 1250-54 (11th Cir. 2019) (Branch, J., dissenting).  The *United States v. Florida* majority, for its part, reasoned that the differences between Title II and Titles I and III of the ADA "should not dictate a conclusion that, absent greater specificity, we should simply assume that a single word [– *i.e.*, *person* –] in § 12133 ends all inquiry." *Id.* at 1228.  Accordingly, the majority embarked on a unnecessarily lengthy and complex analysis, negotiating a "cascade of cross-references" and resorting to a debatable analysis of legislative history, as well as a professed adherence to the overarching legislative purposes, to arrive at a contrary construction. *Id.* at 1229-50.  But the Third Circuit Court of Appeals has instructed that the plain meaning of an enactment is the best indicator of Congressional intent, and that reviewing courts decidedly should not go to such great lengths to divine legislative intent when the words of the subject enactment are straightforward.  *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 257 (3d Cir. 2013).[2]  To the extent an underlying explanation would be needed to support a plain-language interpretation of a statute, Congress could have been concerned that the United States might overzealously wield an enforcement power against state public entities, in tension with the notions of comity and mutual respect undergirding the nation's dual system of government.

---

[2] The majority in the *United States v. Florida* case seemed to be at a loss for a reason why Congress may have wished to omit an enforcement provision from Title II of the ADA that would authorize the federal government to intervene relative to discrimination by state governmental entities. Perhaps the court was focused on the circumstances before it, which presented a concern that the state may have been illegally institutionalizing hundreds of children with disabilities in nursing facilities on an ongoing basis (as contrasted with the present scenario in which the United States has chosen to sue an entire state court system, although it has identified only three closed-ended instances of asserted violations). *See U.S. v. Florida*, 938 F.3d at 1224-25.  Congress, however, may well have wished to restrain the sweep of its authority relative to the portion of the ADA focused on state government services, *i.e.*, Title II – as opposed to Titles I and III, encompassing private employers and entities – based on federalism concerns.

Consequently, the United States lacks standing under a plain reading of Title II of the ADA.

**B.      PLAINTIFF'S COMPONENT-COURTS THEORY OF SYSTEMWIDE LIABILITY IS LEGALLY UNSUSTAINABLE.**

### General Principles

Central to an assessment of Plaintiff's component-courts theory, the UJS is not a conventional organization, such as a corporation or a partnership, or an association with a "top-down" leadership that demands specific results from subordinate entities.  Rather, "the Unified Judicial System" is a descriptive term depicting a complex branch of government, comprised of a multitude of courts and court-related entities.  *See* PA. CONST., art. V, §1; *see also* 42 Pa.C.S. § 301.  It is composed of, *inter alia*: the Supreme Court of Pennsylvania; the intermediate appellate courts, *i.e.*, the Superior Court and the Commonwealth Court; the Philadelphia Municipal Court; the Pittsburgh Magistrates Court; and the magisterial district courts.  *See id.*  The UJS also encompasses the judicial discipline apparatus, including the Court of Judicial Discipline and the Judicial Conduct Board, *see* PA. CONST., art. V, §18, as well as all manner of subunits within the court system, such as the administrative arm of the court system, namely the Administrative Office of Pennsylvania Courts ("AOPC"), and the Pennsylvania Supreme Court's largescale board and committee infrastructure (the Disciplinary Board, the Client Security Fund, the Civil, Criminal and Evidence Committees, to name a few).  Most relevant here, the UJS architecture subsumes sixty local judicial districts in which the courts of common pleas are reposed, spanning sixty-seven counties.  *See* PA. CONST., art. V, §1; *see also* 42 Pa.C.S. § 301.

Each subunit of the UJS that is invested with judicial power is a distinct entity with unique jurisdictional mandates as provided by law.  For example, a core function of the Supreme Court of Pennsylvania is to exercise discretionary review in cases of substantial public importance.  *See*

42 Pa.C.S. § 724; Pa.R.A.P. 1114.[3]  The Commonwealth Court has special responsibility and expertise with respect to matters arising in the administrative-law and election arenas, in addition to being tasked with original and appellate subject-matter jurisdiction in an array of civil matters. *See* 42 Pa.C.S. §§ 761-764.  And the Superior Court has default jurisdiction over appeals from final orders of the courts of common pleas.  *See id.* § 742.

The county courts (or the courts of common pleas), for their part, have unlimited original jurisdiction – as was exercised by the Jefferson and Northumberland County common pleas courts relative to Complainants A, B and C – in all cases except as may otherwise be provided by law. *See* PA. CONST., art. V, §5(b).  The direct supervision of criminal offenders, such as the complainants here, is uniquely committed to the local courts alleged to have committed the infractions.  *See, e.g.*, 42 Pa.C.S. § 9771 (reflecting the ongoing power of common pleas courts to modify or revoke probation orders after criminal sentencing).[4]  Further, the President Judge is the executive head of the local county court.  42 Pa.C.S. § 325(e).

Significantly, Plaintiff's complaint contains no averment that any of the complainants interacted with any UJS entity other than the specified, local courts.  Instead, the complaint alleges

---

[3] While the Supreme Court of Pennsylvania also exercises "general supervisory power" over the state judicial system, *see* PA. CONST., art. V, § 10(a), as further discussed below, this does not suggest an agency relationship amongst the tiers of the UJS or otherwise support the Plaintiff's theory that an entire system of disparate judicial entities is liable for violations by a component part.

[4] Drug treatment court programs, such as the one administered by the Northumberland County Court of Common Pleas, similarly represent a form of post-sentence supervision by local courts, with medical or mental-health professionals and criminal justice stakeholders collaborating in furtherance of rehabilitation and reintegration of criminal offenders.  *See* U.S. Department of Justice, Office of Justice Programs, *Drug Courts* (August 2021), *available at* https://www.ojp.gov/pdffiles1/nij/238527.pdf (last visited Apr. 13, 2022); *Adult Drug Court Best Practice Standards Vol. I*, National Assoc. of Drug Court Professionals 24 (2013), *available at* https://www.nadcp.org/wp-content/uploads/2018/12/Adult-Drug-Court-Best-Practice-Standards-Volume-I-Text-Revision-December-2018-1.pdf (last visited Apr. 13, 2022).

only isolated with three specific criminal defendants occurring solely at one tier of a complex system of judicial entities.  The pleading also offers no recognition or account for the diffuse responsibilities amongst the discrete entities comprising the UJS and no suggestion of how these duties might relate to the alleged violations by the local courts.  Indeed, the lack of any factual allegations establishing a link between the claimed violations by "component courts" and the UJS at large is palpable.

This absence of facts suggesting a systemic nexus between illegal actions committed by local courts and the UJS at large is, in and of itself, fatal to the complaint.  There simply is no viable component-courts theory to support systemwide liability for local infractions.

## The ADA Context

The foregoing, dispositive analysis transcends the context of Title II of the ADA.  Since this case arises in that setting, however, a brief overview of the relevant portions of the enactment follows, and the above reasoning is then applied in that setting.

As previously discussed, Section 202 of the ADA prohibits a "public entity," including state government entities, from denying equal services to individuals or discriminating against them because of their disabilities.  *See* 42 U.S.C. § 12132.  To be actionable under the Title II, a denial or discrimination by or on the part of a public entity must be "by reason of the disability." *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018) (citation omitted).  Further, a plaintiff, such as the United States in this case, who is seeking compensatory damages must prove the denial or discrimination was occasioned with intentionality or deliberate indifference.  *See S.H.*, 729 F.3d at 263-64.

As detailed above, the UJS is not a single "public entity" for Title II purposes (any more than it is for general purposes, as discussed above).  42 U.S.C. § 12132.  Instead, the "public

entities" implicated by Plaintiff's complaint are the discrete local courts alleged to have committed violations of Title II of the ADA.  Again, the complaint ought to be dismissed on this basis alone.  And certainly, to the degree that the judicial system at large theoretically *could* be haled into court to answer for actions of a component part under the Title II, as a straightforward matter of logic, a plaintiff must demonstrate some systemic nexus.  The mere allegation that local courts are part of a larger judicial system, in and of itself, cannot be enough to support systemwide liability for a Title II violation.[5]

The illogic of the bare component-courts theory of liability advanced by the United States is illustrated by *Geness v. AOPC*, 974 F.3d 263 (3d Cir. 2020).  There, a criminal defendant who was mentally disabled and incompetent to stand trial had been detained pursuant to a county court's directives for nearly a decade before the homicide charges lodged against him were finally dismissed.  *See id.* at 267.  The plaintiff claimed that the UJS's administrative arm – *i.e.*, AOPC– had violated Title II of the ADA by failing to sufficiently monitor his individual case and take remedial measures.  *See id.* at 272-73.  Along these lines, the plaintiff highlighted several Rules of Judicial Administration delineating the administrative office's duties, including AOPC's responsibility to monitor the dockets, practices and procedures of local courts and to make recommendations to UJS leaders to expedite litigation.  *See id.* at 276 (citing, *inter alia*, Pa.R.J.A. 505(6)).

---

[5] For example, under agency law precepts, a principal may be liable for an agent's actions within the scope of the agent's authority, precisely because there is a material nexus between the principal and the agent in the form of the agency relationship (or the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking, and the understanding that the principal is in control of the undertaking).  *See, e.g.*, *In re Rotavirus Vaccines Antitrust Litigation*, ___ F.4th ___, 2022 WL 965061, at *2 (3d Cir. Mar. 21, 2022).  There is, of course, no agency-like relationship amongst the judicial entities comprising the UJS.  Indeed, the lack of any authority invested in the county courts to bind higher tiers of the judicial system is inherent in the system of appellate review, whereby the decisions of lower courts are subject to being overturned.

Although the plaintiff's allegations revealed a breakdown at the *local* level of the state judicial system, the Third Circuit granted AOPC's motion to dismiss, concluding that no valid claim had been pled against the UJS's administrative arm, because its operations were at the *systemic* level. *See id.* at 277.  In this respect, the Third Circuit emphasized that AOPC's duties did not encompass "policing potential civil rights violations in particular cases"; the administrative office was not "a judicial back-seat driver" for the county court.  *Id.*

In one line of his argument, the plaintiff in *Geness* contended that, for AOPC to comply with Title II of the ADA, it was required to suggest to the Pennsylvania Supreme Court that his case should be dismissed (given that he was incompetent to stand trial).  *See id.* at 278.  The Third Circuit roundly rejected this position, reasoning that AOPC simply could not be "required to closely monitor, deeply evaluate, and consider intervening in every criminal case pending in the Commonwealth."  *Id.* (quoting from AOPC's reply and accepting it as persuasive); *see also id.* (observing that "AOPC has no power over the disposition of [the plaintiff's] case.").[6]

Turning to this case, the balance of the entities within the UJS (*e.g.*, the Supreme Court of Pennsylvania, the intermediate appellate courts, magisterial district judges, *etc.*) are in no better position to monitor and police discrete civil rights violations allegedly committed by local courts in their direct, day-to-day supervision of criminal offenders than is AOPC; indeed, it is through the administrative office that UJS leaders provide as much systemic monitoring and remediation as is reasonably possible (outside the formal system of hierarchical judicial review).  *See* Pa.R.J.A. 505(6).  *Geness* teaches that these sorts of salutary measures designed to minimize irregularities cannot give rise to systemwide liability in individual cases.

---

[6] In the parlance of Title II of the ADA, direct intervention into the plaintiff's supervision by the local court system was not a "service, program, or activity" that AOPC provides.  *Id.* at 277 (alluding to 42 U.S.C. § 12132).

Indeed, in *King v. Indiana Supreme Court*, several defendants were sued in a *judicial* capacity, but with the same result as in *Geness*. *See King v. Indiana Supreme Court*, No. 1:14-cv-01092, slip op., 2015 WL 2092848 (S.D. Ind. May 5, 2015). There, a plaintiff, who was deaf, attempted to sue court judicial system leaders (*i.e.*, the Indiana Supreme Court and the administrative office for that court) and others for a violation of Title II of the ADA, predicated on a local court's decision to deny the plaintiff access to a sign-language interpreter in the mediation context. *See id.* at *2-3. The complaint against higher tiers of the judicial system failed, because its operative provisions "contain[ed] no allegations that anyone other than the judge of the [county court] took any action or made any decision with regard to the [plaintiff's] specific request for an . . . interpreter." *Id.* at *15. Like the United States here, the plaintiff in that case cited "no legal authority supporting his belief that public entities not alleged to have been involved in or even aware of the decision forming the basis for the ADA claim can be liable for that decision." *Id.*

The United States' component-court theory fares no better in the Title II context than it does in the abstract. The ADA violations asserted in this case occurred in a particular context in which the local courts are uniquely empowered, namely, the direct supervision of criminal offenders, and there is no cognizable component-courts theory of liability that would render the entire state judicial system liable for such local transgressions.

Separately, even if the United States had included factual allegations suggesting a systemwide deficiency (which it has not), it still could not prevail in the absence of averments demonstrating that these deficiencies result in discrimination "by reason of [each complainant's] disability." *Haberle*, 885 F.3d at 178. On this point, just as the plaintiff in *Geness* had failed to present any allegation as to how "AOPC neglected to report the delay in his case to the Pennsylvania Supreme Court 'by reason of his disability,'" *Geness*, 974 F.3d at 278, so too has the

United States failed to establish a connection between a systemic response (or the lack thereof) and disabilities.  For this independent reason, as well, the Plaintiff has not presented a plausible theory of liability implicating the UJS.[7]

Significantly, there is no contrary authority in this jurisdiction to either the rationale of *Geness* or *King.*  In its May 6 letter to this Court, the United States attempts to argue for system-wide liability against the UJS based on *Haybarger v. Lawrence Cnty. Adult Prob. and Parole,* 551 F.3d 193, 190 (3d Cir. 2008).  Yet, the United States overlooks that *Haybarger* was brought against an individual judicial district for alleged violations at the district level; it did not create an ADA cause of action against the UJS as a whole.  *Id.* at 202.  The same holds true with respect to the United States' citation to *Giordano v. Unified Judicial System of Pennsylvania* as that case contains absolutely no analysis or holding with respect to ADA liability for the entire UJS due to the actions of a subcomponent court.  *See*, *generally*, *Giordano v. Unified Jud. Sys. of Pennsylvania*, No. CV 20-277, 2021 WL 1193112, at *1 (E.D. Pa. Mar. 30, 2021) (no analysis of the UJS and the role of its subcomponent courts).

---

[7] The United States may argue that UJS leaders have special powers to intervene in any matter arising within the judicial system, such as the Supreme Court of Pennsylvania's ability to exercise extraordinary jurisdiction.  *See* 42 Pa.C.S. § 726.  Such powers are irrelevant, however, both under *Geness* (because these sorts of extraordinary measures are part of an overall supervisory structure that doesn't displace the county-level responsibility for the direct supervision of criminal offenders), and since any failure on the part of the Supreme Court to invoke these special powers cannot be attributed to a disability.  Along these lines, the most common reasons why such powers are infrequently invoked is both on account of the prerequisite that the case in issue must present a matter of immediate public importance, *see id.*, and, as here, because the wide array of individual matters being handled at the local-court level simply are not brought to the Supreme Court's attention.

Centrally, like AOPC, UJS leaders cannot be "required to closely monitor, deeply evaluate, and consider intervening in every criminal case pending in the Commonwealth," *Geness*, 974 F.3d at 278, and the same rationale applies to monitoring, deeply evaluating, and considering intervening in the post-sentencing supervision of offenders at the local level.

Relative to the claims for compensatory damages, the United States has also failed to allege intentionality or deliberate indifference on the part of the UJS.  *See S.H.*, 729 F.3d at 263-64. Indeed, in the discussion of federalism principles, below, Defendant demonstrates that UJS leaders created mechanisms to prevent foreclosing denials of services to, and discrimination against, individuals with disabilities throughout the Pennsylvania court system.

## The United States as Plaintiff

In Part III(A), above, Defendant contends that the United States lacks standing to pursue claims arising under Title II of the ADA.  But even assuming the federal government is a proper party, it still must establish a claim under the Congressional enactment it has invoked, namely, Title II of the ADA.  *Accord Geness*, 974 F.3d at 278 (highlighting that the relevant analysis turns on whether the plaintiff has set forth "a plausible Title II claim").  Along these lines, the operative terms of the governing statute simply do not change based on the federal government's involvement.  The identity of the plaintiff has no bearing on the multiple, material deficiencies of the complaint delineated above.

## Allusions to Six Other County Courts

Thus far, the arguments have centered on Complainants A, B and C and allegations of specific Title II violations by the courts of common pleas in the Counties of Jefferson and Northumberland.  In the complaint, however, the United States has also included a passage suggesting that six other Pennsylvania county courts "have *or had*" policies that "prohibit or otherwise limit" the use of OUD medication by individuals in treatment-court programs. Complaint at ¶51 (emphasis added).  Obviously, the attempt is to persuade the Court that there are Title II concerns in Pennsylvania extending beyond only two counties.

The assertion that six other local courts "have or had" *their own separate policies* cannot resuscitate the Plaintiff's component-courts theory, however, since it does not transform the nature of the UJS or alter the *Geness* and *King* rationale that discrete derelictions by local courts are not redressable at the systemic level. These separate policies in Jefferson or Northumberland do not show uniform direction or control from a central UJS governing body; they confirm that trial courts are run at a local, county, level. Nor can these allegations change the fact that any hypothetical delay, on the part of UJS leaders, in effecting systemic responses to aberrational decision-making at the local level has nothing to do with anyone's disability. *See Haberle*, 885 F.3d at 178 (specifying the by-reason-of-the-disability requirement to support a claim of a Title II violation).

Significantly, as well, in the complaint, the United States has not identified a single criminal offender currently under court supervision who is actively being subject to discrimination based on OUD, even at the local level. In summary, the United States' brief allusions to problems other county courts "have or had" do not cure the material deficiencies of the complaint, as delineated above.

### Eleventh Amendment Immunity

The Eleventh Amendment renders states, and state entities that function as arms of the state, immune from any lawsuits commenced by citizens. *See Geness*, 974 F.3d at 269. Although Congress has exercised its power to abrogate this immunity for Title II claims, *see id.* at 270, the immunity remains intact relative to entities against which an ADA claim is not validly stated, *see id.* at 278.

*Geness* is again illustrative. There, the Third Circuit held that AOPC's sovereign immunity was not abrogated at a systemic tier of the UJS, where the plaintiff's claim was

derivative from a local court's decision-making in an individual criminal case. *See id.* at 278. Because the plaintiff had failed to set forth a viable Title II claim *against AOPC*, the administrative office's immunity remained intact. *See id.*

Defendant has demonstrated above that the United States has not stated a valid claim against the UJS. It follows, then, that the UJS maintains immunity.

The United States will likely argue that the Eleventh Amendment concerns claims asserted against state entities by *citizens*, and that it is not a citizen for this purpose. Defendant asserts, however, that to the degree that Plaintiff has standing in the first instance, such standing is derivative from the claims of Complainants A, B and C at the very least with respect to the compensatory damages aspects, if not for all claims.[8] In other words, particularly in the absence of any allegation of a systemic nexus to the claimed Title II violations, the fact that the United States has intervened does not change the immunity calculus.

### Federalism

As previously noted, the United States has not apprised the Court of the extensive measures undertaken by UJS leaders to prevent discrimination against individuals with disabilities in the Pennsylvania state court system. There is a dynamic of this case rooted in federalism that the Court should consider, where the federal government is attempting to tarnish an entire state judicial system based on an alleged limited set of infractions claimed to have occurred at the local level, and when the federal government proceeds in this undertaking without saying so much as a single word about the state-court-system leaders' well-documented efforts to require adherence to the requirements of the ADA by all of the system's component parts. In

---

[8] This is particularly the case since as detailed in Part III(A) above, whereas Congress explicitly conferred enforcement powers on the federal government in Titles I and III of the ADA, it has omitted such enabling authority from Title II.

these extraordinary circumstances – in addition to the stricter legal analysis set forth above which independently requires dismissal – it is appropriate for the Court to also consider the following background and reasoning.

Again, the UJS maintains a policy, applicable throughout the Pennsylvania court system, categorically prohibiting discrimination against any individual with a disability, as defined in the ADA. *See* Pa.R.J.A. 250. All UJS entities – including the Pennsylvania judicial districts in which the courts of common pleas are reposed – are required to publicly maintain written policies to receive and process requests for reasonable accommodations from individuals with disabilities, as well as a grievance procedure to address denials. *See* Pa.R.J.A. 252(A), (D). Each entity, including each county court, must appoint an ADA coordinator to administer the process. *See* Pa.R.J.A. 252(B)(1).[9] Further, an ADA coordinator is employed at the state administrative level, also known as the Court Access Coordinator, who extends support to and administers education and training for the judicial districts.[10] The UJS also maintains an Adult Drug/DUI Court Accreditation

---

[9] Both the Jefferson and Northumberland Courts of Common Pleas had ADA coordinators at the time relevant to the allegations raised on behalf of Complainants A, B, and C, and both judicial districts published their policies for court users to seek reasonable accommodation. None of the complainants asked for an accommodation for their use of MAT or accessed the local courts' ADA-grievance procedures.

[10]     *See*          https://www.pacourts.us/judicial-administration/court-programs/americans-with-disabilities-
act#:~:text=For%20information%20about%20reasonable%20accommodations,at%20717%2D23
1%2D9515 (last visited Apr. 12, 2022).

The Supreme Court of Pennsylvania also offers all court users the *Unified Judicial System's Policy on Nondiscrimination and Equal Employment Opportunity*, which is publicly available on the website for the Unified Judicial System at https://www.pacourts.us/Storage/
media/pdfs/20210211/022706-nondiscriminationpolicy-000214.pdf (last visited Mar. 21, 2022). The policy, on page 2, specifically protects criminal defendants with disabilities. On page 5, the policy directs litigants on how to file complaints if they experience discrimination in a judicial district or any of the courts of Pennsylvania.

Program, through which a treatment court's adherence to the "10 Key Components of Drug Courts, which are the nationally recognized framework for program operation is assessed. *See* https://www.pacourts.us/judicial-administration/court-programs/drug-courts (last visited Apr. 12, 2022); *see also* U.S. Dep't of Justice, Bureau of Justice Assistance, *Defining Drug Courts: The Key Components* (Reprinted Oct. 2004), *available at* https://www.ojp.gov/pdffiles1/bja/205621.pdf (last visited Apr. 12, 2022).

In summary, the UJS has systemwide policies and practices in place requiring local courts to comply with the Title II of the ADA and empowering them with tools, education and training to aid in the fulfillment of their responsibilities under that remedial federal enactment. The United States might have some pragmatic reason it desires to hale the UJS into court to answer for alleged infractions by a few "component courts." For example, a one-stop-shop approach makes the job of its Department of Justice (the "DOJ" or the "Department") easier, and perhaps the Department wishes to set a national example to advance policies. But there are strong countervailing reasons why – even if the UJS theoretically *could* be held vicariously liable for infractions of component courts – it is legally and prudentially inappropriate for the entire state court system to be haled into federal court on the facts alleged in the present complaint.

By its own account, the United States has conducted a lengthy investigation of the UJS (three years long by Defendant's count) and has identified only three individuals impacted by the actions of county courts in their direct supervision of criminal offenders. There is no question that – particularly in the judicial system of a large state such as Pennsylvania – some mistakes will be made in the sixty judicial districts. The fact, for example, that the administrative order was rescinded within several months in Jefferson County should be viewed more as a credit to the larger system than as a failing. Further, the UJS has three appellate-level courts to correct

judicial error at the trial court level.  The United States does not allege that any court user with

OUD has been denied access to the remedial aspects of the UJS (e.g., appellate courts or Pa.R.J.A.

250).

Consequently, consistent with principles of federalism, if the United States is going to be

permitted to pursue relief against Pennsylvania's entire judicial system, it should at the very least

be required to present some accounting for the policies and procedures that the UJS has in place

and to demonstrate some sort of a *systemic* failing.  The complaint speaks for itself in

demonstrating that Plaintiff has made no such allegation.

### C.   THE UNITED STATES HAS FAILED TO PLEAD, AND CANNOT IN GOOD FAITH PLEAD, THAT COMPLIANCE CANNOT BE SECURED BY VOLUNTARY MEANS.

To the extent the United States has standing to litigate an enforcement action under Title

II of the ADA, it is required both to determine that compliance with Title II "cannot be secured by

voluntary means," 42 U.S.C. § 2000d-1,[11] and to make a good-faith assertion that it has done so

in the complaint.  *See U.S. v. Arkansas*, No. 4:10CV00327, slip op., 2011 WL 251107, at *4

("Because [DOJ] is not entitled to seek relief unless it has '. . . determined that compliance cannot

be secured by voluntary means[,]' it would seem that [Fed.R.Civ.P.] 8(a) requires that the

---

[11] The above requirement does not appear in Title II of the ADA directly; rather, it is reposited in Title VI of the Civil Rights Act of 1964.  The enforcement provisions of Title VI are integrated into Title II via the "cascade of cross-references" relied upon by the *United States v. Florida* majority in support of its determination that the federal government has standing to pursue an enforcement action in the Title II context.  *U.S. v. Florida*, 938 F.3d at 1229.  To the extent the United States has standing in this case, which Defendant disputes, *see supra* Part III(A), it is solely via this analysis of cascading cross-references incorporating Section 2000d-1.  Indeed, in another Title II case, the Department of Justice "concede[d] that it is required to comply with the statutory prerequisites stated in 42 U.S.C. § 2000d-1."  *U.S. v. Arkansas*, No. 4:10CV00327, 2011 WL 251107, at *4 (E.D. Ark. Jan. 24, 2011).

complaint include allegations sufficient to indicate that those prerequisites to suit have been met." (quoting 42 U.S.C. § 2000d-1)).  No such assertion appears in Plaintiff's complaint here, however.

Moreover, the United States simply could not, in good faith, aver that voluntary compliance with Title II by the UJS could not be achieved, not the least on account of UJS leaders' extensive, systemic efforts to maintain compliance throughout the Pennsylvania judiciary.  The course of the interactions between DOJ and UJS lawyers is also instructive.

On March 8, 2021 DOJ attorneys requested information about statewide problem-solving court policies with respect to MAT.  Exhibit A.  In response, UJS lawyers provided the DOJ with a written response, *see* Exhibit B (attachments excluded), together with a series of interchanges through which Defendant's attorneys transmitted relevant documentation.  Thereafter, counsel believed this was a sufficient response (since the DOJ never asked for additional information after all documents had been submitted in the various interchanges).

On February 2, 2022, the United States sent a letter to Defendant's legal counsel containing "Findings and Conclusions" resulting from its investigation that accord with the averments of the present complaint and proposing "corrective measures" consistent with Plaintiff's present prayer for relief.  Exhibit C.

After an ensuing telephone conference on February 15, 2022, the Court Administrator of Pennsylvania, Geoff Moulton, on February 23, 2022, presented a written response to the DOJ, attached as Exhibit D, reaffirming a "firm representation and assurance of the Pennsylvania courts' commitment to comply fully with the [ADA]."  The Court Administrator referenced the governing UJS policy requiring component courts to comply with the ADA, *see* Pa.R.J.A. 250-251, and discussed the ADA-compliance infrastructure integrated into the state court system, as detailed above.

Furthermore, the Court Administrator explained:

AOPC has informed all of Pennsylvania's president judges of the ADA's requirements relative to the use of [MAT] by court-supervised individuals suffering from OUD. AOPC's Problem Solving Courts Coordinator regularly provides training to treatment court team members about OUD and MAT. There are numerous training opportunities for Pennsylvania's court administrators and treatment court team members this year. We will use these occasions to continue to train on ADA access, grievance procedures for litigants who need an ADA accommodation, best practices in treatment courts, and how to best inform treatment court participants about the availability of MAT for OUD.

Along these lines, the Court Administrator urged the DOJ to "recognize the considerable, ongoing efforts of [UJS leaders] to assist Pennsylvania's judicial districts in maintaining statewide compliance with the ADA[.]" *Id.* at 2.

The Court Administrator also renewed the invitation, previously extended by UJS attorneys on February 15, 2022, for the DOJ to itemize recoverable monetary damages that were contended to have been sustained by the complainants. Finally, the Court Administrator repeated the UJS lawyers' request for the Department to advise of any particular training materials or best practices that it believes should be shared with the judicial districts. *See id.*

The next day, however, without responding to any of these overtures, Plaintiff proceeded to file the present complaint.[12]

---

[12] The DOJ had requested that Defendant enter into an agreement tolling all applicable statutes of limitations to forestall litigation. While the Court Administrator and UJS lawyers invited ongoing discussions, they were not willing to enter into such an agreement, given their position that the targeting of the entire UJS was misguided and without even a ballpark estimate of what damages the United States was pursuing. For these reasons – as the circumstances of Complainants A, B and C were well known to the Department for years prior to the filing of the complaint, and since the UJS was under no obligation to enter into a tolling agreement – the DOJ's request for a tolling agreement has no bearing on Plaintiff's failure to determine and certify that UJS compliance with Title II cannot be attained by voluntary means.

In the circumstances, the United States simply cannot, in good faith, make a representation to this Court that voluntary compliance with Title II of the ADA cannot be obtained from the UJS. This serves as another reason supporting the complaint's dismissal.

### D.  THE TITLE II CLAIMS ASSERTED ON BEHALF OF THE COMPLAINANTS ARE TIME-BARRED.

The period of limitations allowed for filing claims premised on the August 2018 order of the Jefferson County Court of Common Pleas has expired.  As the Plaintiff's initial pleading alleges, Complainants A and B were precluded from using MAT for their opioid use disorders while an administrative order of the county court banning such treatment for individuals under the local court's supervision remained in place.  Plaintiff's complaint relates that such order was entered on August 3, 2018, and was effective for four and one-half months, or until mid-December, 2018.  *See* Complaint at ¶¶15-16.[13]  Plaintiff further relates that, after the administrative order was rescinded, both Complainants A and B resumed their MAT regimes.  *See id.* ¶¶24, 32.

Given that the ADA contains no statute of limitations, the Third Circuit has determined that the limitations period for personal injury claims under Pennsylvania law applies to ADA claims.  *See Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 602 (3d Cir. 2015); *Disabled in Action of Pa. v. SEPTA*, 539 F.3d 199, 208 (3d Cir. 2008).  Under Pennsylvania law, "personal injury claims must be brought within two years of the accrual of the claim."  *Id.* (citing 42 Pa.C.S. § 5524(7)).

The last possible date of accrual here is December 21, 2018, when the order alleged to have been causing the harm to the complainants was rescinded.  Since the present complaint was filed

---

[13] The specific date on which the order was rescinded was December 21, 2018.

more than two years after that date, the claims asserted on behalf of Complainants A and B are out of time by over a year.

Plaintiff may argue that, since the United States is advancing the cause of action here, the three-year statute of limitations pertaining to tort actions commenced by the federal government should pertain.  *See* 28 U.S.C. § 2415(b).[14]  Defendant maintains, however, that even if the United States has standing here, the claims for compensatory damages should be treated as derivative from the rights and entitlements of the individual complainants.  In any event, even if a three-year statute pertains, this period of limitations expired more than two months before Plaintiff filed the complaint on February 24, 2022.

## VI.    CONCLUSION

Plaintiff comes before this Court wielding the power of the federal government to impugn the entire Pennsylvania judicial system for violating the Americans with Disabilities Act, without so much as identifying a single wrong perpetrated at a systemic level.  Centrally, there is no claim that UJS leaders have failed to adopt a policy prohibiting discrimination against individuals with disabilities.  The United States makes no allegation that UJS leaders have not undertaken extensive measures to safeguard the rights of individuals with disabilities.  Rather, UJS leaders have in fact mandated compliance throughout all tiers of the judicial hierarchy and established robust

---

[14] This statute prescribes:

> Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues.

28 U.S.C. § 2415(b).

enforcement and support mechanisms.  And there is no contention that the Unified Judicial System

lacks mechanisms to correct violations occurring at the local level.  Instead, there are multiple such

mechanisms, including an ADA compliance infrastructure spanning the various tiers of the UJS,

as well as a remedial system of appellate review.

    For these and the other reasons set forth in the body of this brief, Plaintiff's complaint should

be dismissed with prejudice.

                                        Respectfully submitted,


                                        **/s/Robert J. Krandel**
                                        ROBERT J. KRANDEL
                                        Attorney I.D. No. PA89485
                                        GERI R. ST. JOSEPH
                                        Attorney I.D. No. PA84902
                                        Supreme Court of Pennsylvania
                                        Administrative Office of PA Courts
                                        1515 Market Street, Suite 1414
                                        Philadelphia, PA 19102
                                        legaldepartment@pacourts.us
                                        (215) 560-6300, Fax: (215) 560-5486

                                        ***Counsel for Defendant Unified Judicial***
                                        ***System***

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | |
| | : | No.  22-cv-00709 |
| v. | : | |
| | : | |
| THE UNIFIED JUDICIAL SYSTEM | : | |
| OF PENNSYLVANIA, | : | |
| | : | |
| *Defendant* | : | |

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on June 10, 2022, he personally caused to be served upon the following a true and correct copy of the foregoing *Motion to Dismiss, and Brief in Support of Motion*, via CM/ECF to:

**David W. Knight, Esquire**
Civil Rights Division
Disability Rights Section
USAO Program Coordinator
950 Pennsylvania Avenue, NW
4-CON
Washington, DC 20530
Email: david.knight@usdoj.gov

**Adam F. Lewis, Esquire**
DOJ-Crt
Civil Rights Division
4 Constitution Square
150 M Street NE
Washington, DC 20530
202-305-6797
Email: adam.lewis@usdoj.gov

**Jacqueline Christine Romero, Esquire**
US Attorney's Office
615 Chestnut Street
Philadelphia, Pa  19106
Email: jacqueline.romero@usdoj.gov

**Michael J. Butler, Esquire**
US Attorney's Office- MDPA
228 Walnut Street, Suite 220
Harrisburg, Pa  17108
Email: michael.j.butler@usdoj.gov

<u>**/s/Robert J. Krandel**</u>
ROBERT J. KRANDEL
Attorney I.D. No. PA89485
GERI R. ST. JOSEPH
Attorney I.D. No. PA84902
Supreme Court of Pennsylvania
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
<u>legaldepartment@pacourts.us</u>
(215) 560-6300, Fax: (215) 560-5486

***Counsel for Defendant Unified Judicial
System***