**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 22-cv-00709 |
| THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA, | |
| Defendant. | |

## <u>ORDER</u>

AND NOW, this _____ day of _____ 2022, upon consideration of the

Unified Judicial System of Pennsylvania's Motion to Dismiss the Complaint, the United States

of America's Opposition thereto, and any oral argument, it is hereby ORDERED that the motion

is DENIED.

BY THE COURT:

_____
MITCHELL S. GOLDBERG
United States District Court Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 22-cv-00709 |
| THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA, | |
| Defendant. | |

## UNITED STATES OF AMERICA'S OPPOSITION TO THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA'S MOTION TO DISMISS

State courts in the Commonwealth of Pennsylvania are impermissibly curtailing life-saving treatment for Opioid Use Disorder (OUD) based on unfounded assumptions and stereotypes about disability. *See, e.g.*, Compl. ¶ 15, ECF No. 1. Arbitrary restrictions preventing individuals under court supervision from taking legally prescribed medications necessary to treat their disabilities discriminate based on disability and threaten the health and safety of these individuals and the larger community. The United States has stated a claim that the Unified Judicial System of Pennsylvania (UJS) has violated the Americans with Disabilities Act (ADA) through discriminatory policies and practices, implemented by its component courts, that deny individuals with disabilities a full and equal opportunity to participate in and benefit from UJS services, programs, or activities.

The UJS, as a *unified* court system, is responsible for the discriminatory policies and actions of its component courts, and has the power to remedy that discrimination. The Pennsylvania Constitution makes clear that all county courts are part of the UJS, and all UJS courts are subject to the centralized supervisory and administrative authority of the Pennsylvania Supreme Court. PA. CONST. art. V, §§ 1, 10(a). Indeed, the UJS acknowledges it has used this

authority to require "[a]ll UJS entities—including the Pennsylvania judicial districts in which the courts of common pleas are reposed—" to maintain certain policies aimed at preventing disability discrimination. Def.'s Br. in Supp. of Mot. to Dismiss 18. Those efforts, however, have failed to prevent the discrimination alleged. And with each day the UJS fails to remedy its discrimination, more individuals under Pennsylvania court supervision may be put at risk.

The discriminatory conduct alleged by the United States is administrative in nature and falls squarely within the UJS's control. To be clear, the United States is *not* challenging Pennsylvania judges' individualized assessments of specific probationers. Rather, the United States alleges that the UJS component courts at issue are conducting no individualized assessments whatsoever. They have adopted blanket restrictions on prescription OUD medications for everyone under court supervision or in certain court programs. *Id.* ¶¶ 53-58. And they have enforced and continue to enforce these restrictions contrary to prevailing medical guidance—in some instances, over the specific objections of physicians treating those subject to the restrictions. *Id.* ¶¶ 9-12, 46. These practices cannot be reconciled with the ADA.

The United States' Complaint plainly alleges facts showing that UJS courts have violated and continue to violate the ADA by prohibiting or otherwise limiting the use of OUD medication by individuals under court supervision. The United States also alleges facts showing that the UJS as a whole is responsible for and capable of redressing the misconduct alleged. Accordingly, the Court should deny the UJS's Motion.

## II.   STATEMENT OF ISSUES TO BE DECIDED

A.   Whether the United States plausibly alleges that the UJS has violated the ADA, where eight separate UJS courts have categorically restricted the ability of individuals with OUD to take their lawfully prescribed medication and the UJS has failed to exercise its constitutionally

established centralized supervisory and administrative authority to prevent this discriminatory conduct;

B.      Whether the United States plausibly alleges, consistent with Federal Rule of Civil Procedure 9(c), that it has satisfied all conditions precedent to filing suit;

C.      Whether the United States' claim for damages for two of the identified complainants is time-barred, where the applicable limitation period for damages is three years and does not include time during which facts material to the right of action (including harm suffered by individuals) were not known to the United States; and

D.      Whether the United States has authority to file suit under Title II of the ADA where the "remedies, procedures, and rights" Title II provides to persons alleging discrimination include the right to initiate an administrative enforcement process that can culminate in a civil action by the Attorney General.

## III.   FACTUAL BACKGROUND

The UJS has unlawfully discriminated against individuals with OUD in its court supervision programs, in violation of the ADA, by prohibiting or otherwise limiting the use of medication prescribed to treat their disabilities.  Compl. ¶ 1.  The medications at issue—methadone, naltrexone, and buprenorphine—are approved by the Food and Drug Administration to treat OUD and are most effective when prescribed for as long as they provide a benefit, which in some cases may be indefinitely.  *Id.* ¶¶ 9-11.  Accordingly, the Substance Abuse and Mental Health Services Administration (SAMHSA)—an agency within the U.S. Department of Health and Human Services—advises that any decision to stop a patient's use of OUD medication should be made collaboratively by a patient and their medical provider and should be based on an individualized assessment of the patient's treatment needs.  *Id.* ¶ 12.  SAMHSA cautions

against imposing arbitrary time limits on the duration of treatment with OUD medication.  *Id.*

Numerous UJS courts have ignored this prevailing medical guidance and have put probationers' lives at risk by categorically restricting access to OUD medication.  The Blair County Court of Common Pleas, for example, categorically prohibits all participants in its treatment courts from taking any OUD medication other than Vivitrol (*i.e.*, naltrexone); it does not allow the use of other commonly prescribed medications such as methadone or buprenorphine.  *Id.* ¶ 54.  Other UJS courts, including the Courts of Common Pleas in Allegheny, Butler, Clinton, Delaware, Jefferson, Northumberland, and York Counties, have or had similar administrative policies that categorically restrict the use of OUD medication by individuals in "treatment court" programs.  *Id.* ¶¶ 15-16, 42-53, 55-58.

In August 2018, the President Judge of the Jefferson County Court of Common Pleas issued an administrative order requiring all individuals under the court's supervision to cease use of medication for OUD within 30 days of being sentenced.  *Id.* ¶ 15.  That order remained in place for over four and a half months.  *Id.* ¶¶ 16-17.  During that period, Complainant A's probation officer told her that if she did not comply with the court's order she would be considered in violation of her probation and sent to jail.  *Id.* ¶ 21.  When Complainant A told her doctor that she had to taper off her prescribed medication, he told her that if she did she might relapse and die.  *Id.* ¶ 22.  As a result of following the court's order, Complainant A endured withdrawal symptoms that caused her severe physical discomfort, suffered mood swings that strained her closest relationships, and risked that she might be unable to resist returning to illicit opioid abuse and would thereby put her life in jeopardy.  *Id.* ¶¶ 23, 10, 12.

Complainant B, as a participant in the Jefferson County Court's Accelerated Rehabilitative Disposition program, was subject to the same blanket order prohibiting the use of

OUD medication. *Id.* ¶¶ 27-28. She too tried to comply with the court's order and suffered severe withdrawal symptoms, including insomnia, cramps, abdominal pain, nausea, and vomiting. *Id.* ¶ 29. She required emergency treatment at least once and had to spend more than a month in inpatient residential treatment to wean off of her OUD medication. *Id.* ¶¶ 30-31.

Complainant C was a participant in the Northumberland County Drug Court Program for approximately four years. *Id.* ¶¶ 40-47. At the very outset of the program, the Treatment Court Team told Complainant C that to continue or advance she would need to stop taking her prescribed medication. *Id.* ¶ 42. The Treatment Court Team then took various steps to pressure Complainant C into complying with this requirement. *Id.* ¶¶ 42-46. They sent her to an inpatient treatment rehabilitation facility to be taken off of her medication, referred her to an abstinence-based intensive outpatient treatment program that restricted her participation because of her OUD medication, delayed her progress through the phases of drug court despite her satisfaction of all other advancement criteria, and repeatedly directed her to stop using her medication. *Id.* ¶¶ 43-46. The Treatment Court Team persisted in these efforts even after being informed by Complainant C's doctor that she was doing well on her medication and that tapering her off of it "could put her at increased risk of relapse, overdose, and death." *Id.* ¶ 46. Complainant C experienced severe side effects when she attempted to comply with the court's directives, including body aches, soreness, backpain, diarrhea, depression, anxiety, and increased opioid cravings that made her fear that she would relapse. *Id.* ¶¶ 47-48.

The policies applied to Complainants A, B, and C, and the policies enacted by the other six identified county courts, impose blanket administrative restrictions on access to OUD medication and have harmed other individuals with OUD under UJS court supervision, putting them in similarly untenable positions. *Id.* ¶¶ 15, 42, 51-58, Prayer for Relief ¶ G.

## IV.   LEGAL FRAMEWORK

Title II of the ADA prohibits public entities, such as States and state agencies, from discriminating based on disability in their provision of "services, programs, or activities."  42 U.S.C. §§ 12131(1)(A)-(B), 12132.  The phrase "service, program, or activity" is extremely broad in scope and includes anything a public entity does.  *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-12 (1998) (discussing the breadth of Title II's coverage).

Public entities violate Title II when they fail to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from their services, programs, or activities.  28 C.F.R. § 35.130(b)(i)-(iii).  Discrimination under Title II includes imposing eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.  *Id.* § 35.130(b)(8). Discrimination also includes using methods of administration that (i) have the effect of discriminating against qualified individuals on the basis of disability; or (ii) have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.  *Id.* § 35.130(b)(3).

Public entities may impose legitimate safety requirements necessary to safely operate their services, programs, or activities, but only if such requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.  *Id.* § 35.130(h).  A public entity also is not required to permit an individual to participate in or benefit from its services, programs, or activities if the individual poses a direct threat to the health or safety of others.  *Id.* § 35.139(a).  To determine that an individual constitutes a direct

threat to others, however, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.  *Id.* § 35.139(b).

The United States sufficiently states a claim under Title II when it alleges that the aggrieved persons whose rights it seeks to vindicate: (1) are qualified individuals with disabilities; (2) were denied the benefits of or otherwise discriminated against in a public entity's public service, program, or activity; and (3) were subjected to such discrimination on the basis of their disability.  *See Furgess*, 933 F.3d at 288-89.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In determining whether a plaintiff has stated a plausible claim, the court must view the complaint in the light most favorable to the plaintiff and generally considers only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record.  *Doe v. Univ. of the Scis.*, 961 F.3d 203, 208 (3d Cir. 2020).

## V.   ARGUMENT

The United States has stated a plausible claim to relief that is more than sufficient to survive dismissal.  First, the United States plausibly alleges that the UJS has violated and continues to violate Title II of the ADA by prohibiting or otherwise limiting the access of

individuals with OUD to lawfully prescribed medication that is critical to their health and survival.  Second, the United States has adequately pled that it attempted to secure voluntary compliance before filing suit.  Third, the United States' claim, which seeks both equitable relief and damages, is not time barred.  Fourth, the United States has authority to file suit under Title II.  For all of these reasons, the UJS's Motion should be denied.

### A.    The United States Plausibly Alleges That the UJS Has Violated Title II by Limiting the Access of Individuals with OUD to Their Prescribed Medication

The UJS does not appear to dispute that the United States adequately alleges that Complainants A, B, and C are qualified individuals with disabilities who were discriminated against on the basis of disability while under state court supervision.[1]  Nor does the UJS appear to dispute that the alleged restrictions imposed on OUD medication by the eight identified county courts are potentially discriminatory.  Instead, the UJS argues that it is not responsible for that discrimination because the county courts at issue are somehow "subunit[s] of the UJS" but also "distinct entit[ies]."  Def.'s Br. 8.  This argument is unsupported by the plain language of the Pennsylvania Constitution, by Pennsylvania's Judicial Code and Rules of Judicial Administration, by the Pennsylvania Supreme Court's own jurisprudence, and by Third Circuit case law.  These authorities make clear that the conduct of the county courts *is* the conduct of the UJS.  And the discriminatory administrative policies adopted by those courts are squarely within the responsibility and authority of the UJS to correct.  Therefore, the UJS is the appropriate defendant in this case.

---

[1] In addressing the United States' allegations of discrimination against Complainants A, B, and C, the UJS acknowledges that "[t]here is no question that – particularly in the judicial system of a large state such as Pennsylvania – some mistakes will be made in the sixty judicial districts." Def.'s Br. 19.

1. *The Identified County Courts Are Part of the UJS—They Are Not Distinct Legal Entities*

The Pennsylvania Constitution expressly provides that "[t]he judicial power of the Commonwealth shall be vested in a *unified* judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas . . . [and] such other courts as may be provided by law and justices of the peace." PA. CONST. art. V, § 1 (emphasis added). The Constitution further states that "[a]ll courts and justices of the peace and their jurisdiction shall be in this unified judicial system." *Id.* This definition of the unified system as encompassing all state courts is reiterated in statutory provisions of the Pennsylvania Judicial Code. *See* 42 Pa.C.S. § 301. It is reflected in multiple Pennsylvania Rules of Judicial Administration. *See, e.g.,* Pa.R.J.A. 252, 262 (noting their application to all entities in the UJS, including trial courts, appellate courts, judicial districts and other agencies or offices operating under the administrative authority of the Supreme Court). It has also been explicitly recognized by the Pennsylvania Supreme Court. *See In re Bruno*, 101 A.3d 635, 622 (Pa. 2014) ("The Constitution states that enumerated courts of the Commonwealth and magisterial district judges . . . compose the Unified Judicial System.").

Relying on these authorities, the Third Circuit has affirmed that Pennsylvania county courts of common pleas are legally indistinguishable from and subject to the central administrative control of the UJS. In *Callahan v. City of Philadelphia*, 207 F.3d 668, 673 (3d Cir. 2000), the Third Circuit found it "perfectly clear" that two specific court units within the First Judicial District were "part of the unified judicial system subject to the control of the Supreme Court" and "hardly can be regarded as having significant autonomy from the Pennsylvania Supreme Court." *See also Benn v. First Jud. Dist. of Pa.*, 426 F.3d 233, 241 (3d Cir. 2005) ("The Pennsylvania constitution envisions a unified state judicial system, of which the

Judicial District is an integral component."). And in *Haybarger v. Lawrence County Adult Probation and Parole*, 551 F.3d 193, 198 (3d Cir. 2008), the Third Circuit, citing its earlier opinion in *Benn*, emphasized that "all courts and agencies of the UJS are part of the Commonwealth government rather than local entities."[2]

The Third Circuit's recognition that county courts and judicial districts are "integral components" of the UJS is dictated by the plain language of the Pennsylvania Constitution. *See In re Bruno*, 101 A.3d at 659 ("As an interpretive matter, the polestar of constitutional analysis undertaken by the Court must be the plain language of the constitutional provisions at issue."). By contrast, the UJS's argument renders key provisions of the Pennsylvania Constitution, Judicial Code, and Rules of Judicial Administration, including their repeated use of the term "unified," virtually meaningless. This is simply wrong.

> 2. *The UJS Has the Power and Responsibility to Ensure That County Courts Do Not Adopt Blanket Discriminatory Administrative Policies and Practices*

The term "unified," as used in the Pennsylvania Constitution, is not just "descriptive" as the UJS suggests. Def.'s Br. 8. The UJS *is* unified and its component courts are bound together

---

[2] The UJS incorrectly asserts that the United States relies on *Haybarger* for the proposition that *Haybarger* created an ADA cause of action against the UJS as a whole. Def.'s Br. 14. The United States cites *Haybarger* as an illustration of the Third Circuit's consistent treatment of county courts as legally indistinguishable from the UJS. Moreover, this District has allowed a suit against the UJS to proceed based on the discriminatory actions of a single component court. *See Giordano v. Unified Jud. Sys. of Pa.*, No. 20-277, 2021 WL 1193112 (E.D. Pa. Mar. 30, 2021). In *Giordano*, an employee of the Superior Court of Pennsylvania (an intermediate appellate court) alleged employment discrimination and brought claims under various civil rights statutes against the UJS, the Superior Court of Pennsylvania, and individual court executives in their official capacities. *Id.* at *1. As relevant here, Giordano's retaliation claim against the UJS under Title VII of the Civil Rights Act of 1964—premised on the same conduct by Superior Court employees—survived dismissal. Giordano's ADA claims also survived dismissal. *Id.*, at *3. But because those claims were brought only against the individual defendants (not the UJS), that aspect of the case is not informative to the question before this Court.

under the centralized administrative and supervisory authority of the Pennsylvania Supreme Court.

The Constitution and the Pennsylvania Judicial Code provide that the "[t]he Supreme Court shall exercise general supervisory and administrative authority" over the entire UJS.  PA. CONST. art. V, § 10(a); 42 Pa.C.S. § 1701.  This includes the power to prescribe and modify general rules governing "the administration of all courts."  PA. CONST. art. V, § 10(a); 42 Pa.C.S. § 1722.  While local courts, and their president judges, are given some power to create their own "local rules," the Pennsylvania Constitution, Judicial Code, and Rules of Judicial Administration make clear this power is subservient to the Supreme Court's and that any local rules cannot be "inconsistent with any . . . rule of the Supreme Court."  Pa.R.J.A. 103(c)(2); *see also* 42 Pa.C.S. §§ 323, 1722.  Indeed, the Supreme Court has stated that "it is fully within [its] authority to prescribe the powers and duties of the president judges and any limitations thereon."  *In re Blake*, 593 A.2d 1267, 1269 (Pa. 1991).  The Judicial Code also specifically recognizes the Supreme Court's power to trump local rules in the "administration of problem-solving courts and their related treatment services"—the primary courts and services at issue here.  *See* 42 Pa.C.S. § 916(a).

The centralized administrative authority that the Pennsylvania Constitution places in the Supreme Court enables the Supreme Court to ensure "the various parts of the [unified judicial] system operate together to ensure access to justice, justice in fact, and the appearance that justice is being administered even-handedly."  *In re Bruno*, 101 A.3d at 664 (citing PA. CONST. art. V, § 10).  This centralized administrative authority is of particular importance here because the discriminatory conduct alleged is administrative in nature.  The United States is not challenging or seeking to interfere with appropriate exercises of judicial discretion in individual cases.

11

Rather, the United States is challenging blanket administrative restrictions that local courts have imposed on the use of OUD treatment medication regardless of the individual circumstances or treatment needs of specific probationers. *Cf. Strickland v. Delaware Cnty.*, No. CV 21-4141, 2022 WL 1157485, at *3 (E.D. Pa. Apr. 19, 2022) (finding incarcerated individual plausibly alleged disability discrimination where correctional facility denied him prescribed methadone as a matter of administrative policy and "failed to undertake any individualized review" to determine whether he could be safely provided with his prescribed medical treatment).

      The authorities described above make clear that the UJS can lift these restrictions, remedy the discrimination alleged, and prevent such discrimination from recurring. The UJS's reliance on *Geness v. Administrative Office of Pennsylvania Courts*, 974 F.3d 263 (3d Cir. 2020), to suggest otherwise is misplaced. In that case, the Administrative Office of Pennsylvania Courts (AOPC) was not liable under the ADA for the mishandling of Mr. Geness's case because it had no power to hold the criminal trial that Mr. Geness had been purportedly denied. *Id.* at 278. In other words, AOPC did not and could not provide the relief Mr. Geness sought. No such issue exists here. The United States has sued the UJS, not AOPC. The UJS provides the court supervision services and treatment court programs at issue here and has the power to ensure that individuals with OUD are not, as a matter of blanket administrative policy, denied their legally prescribed medication as a condition of participation.[3]

      As the UJS admits, it has previously exercised the centralized administrative authority entrusted to the Supreme Court to require all UJS entities to take steps to prevent disability

---

[3] The UJS's citation to *King v. Indiana Supreme Court*, No. 1:14-cv-01092-JMS-MJD, 2015 WL 2092848 (S.D. Ind. May 5, 2015), is also misplaced. Indiana "does not have a unified trial court system," *id.* at *13, nor does the Indiana Constitution explicitly grant the state supreme court general administrative authority over the court system as does the Pennsylvania Constitution, *compare* PA. CONST. art. V, § 10, *with* IND. CONST. art. VII.

discrimination.  Def.'s Br. 18.  The UJS has required its component courts and agencies to

maintain certain anti-discrimination policies.  *Id.*  It has required local courts to appoint

personnel to implement those policies.  *Id.*  And it has provided resources and accreditation

programs to its local courts to aid in implementation.  *Id.* at 18-19.

The problem is *not* that the UJS is incapable of taking the corrective actions the United

States seeks; it has taken similar corrective actions in the past.[4]  The problem is that the UJS has

failed to take the necessary action to prevent the discrimination at issue and has allowed blanket

discriminatory policies and practices to endanger the lives of those with OUD under court

supervision.  The UJS and United States may well disagree on the scope of relief that is

necessary.  That, however, is a question of fact that should be resolved much later in the

litigation if liability is established following discovery and adjudication of the merits.  *Cf. Int'l*

*Bhd. of Teamsters v. United States*, 431 U.S. 324, 361 (1977) ("When the Government seeks

individual relief for the victims of [a] discriminatory practice, a district court must usually

conduct additional proceedings after the liability phase of the trial to determine the scope of

individual relief.").  At this stage, the only question the Court must answer is whether, viewing

the Complaint in the light most favorable to the plaintiff, the United States has plausibly alleged

---

[4] The United States notes, as a matter of public record, that it has previously entered into an agreement with the UJS to resolve civil rights violations.  *See Memorandum of Understanding Between the United States of America and the Unified Judicial System of Pennsylvania*, U.S. Dep't of Just., C.R. Div. (Apr. 24, 2017), https://www.justice.gov/crt/page/file/959891/download.  This Agreement, aimed at ensuring the UJS provided qualified interpreters for litigants with limited English proficiency as required by Title VI of the Civil Rights Act of 1964, expressly acknowledged the "UJS's continuing obligation to comply with . . . federal laws, including the Americans with Disabilities Act," and recognized the Supreme Court of Pennsylvania's power to adopt policies that are binding on the entire UJS.  *Id.* at 3, 5.

that the UJS violated Title II of the ADA and can provide the relief sought.  The answer to that question is yes.

### 3. Neither Sovereign Immunity Nor Principles of Federalism Prevent the United States from Suing the UJS for Violating Title II

This suit is consistent with the Eleventh Amendment and does not offend federalism principles.  Although the United States filed this action to vindicate the rights of affected individuals with disabilities, it brings suit in its own name and does not represent any individual complainant.  *Cf. Smith v. City of Phila.*, 345 F. Supp. 2d 482, 489-90 (E.D. Pa. 2004) (concluding the United States' Title II suit could proceed, even after individual claims were dismissed).  Therefore, contrary to the UJS's argument, questions of whether Eleventh Amendment immunity is abrogated—which are pertinent only to lawsuits commenced by private citizens—are irrelevant here.

Indeed, the Eleventh Amendment does not bar this action because "States retain no sovereign immunity as against the Federal Government."  *West Virginia v. United States*, 479 U.S. 305, 311 n.4 (1987).  That is so because, "[i]n ratifying the Constitution, the States consented to suits brought by . . . the Federal Government."  *Alden v. Maine*, 527 U.S. 706, 755 (1999); *see also United States v. Mississippi*, 380 U.S. 128, 140 (1965) ("[No] provision of the Constitution prevents or has ever been seriously supposed to prevent a State's being sued by the United States."); *United States v. Florida*, 938 F.3d 1221, 1250 (11th Cir. 2019) (explaining that "States do not retain sovereign immunity from suits brought by the federal government" and holding that the United States' Title II suit against a State could proceed), *reh'g en banc denied*, 21 F.4th 730 (11th Cir. 2021), *petition for cert. filed*, No. 21-1384 (Apr. 21, 2022).

Finally, no "principles of federalism" preclude this action and, notably, the UJS cites no authority for such a proposition.  Def.'s Br. 17-20.  The United States' allegations support the

reasonable inference that the discrimination alleged is a systemic failure, that the UJS has not taken necessary steps to address it, and that it can do so.  The UJS touts its generalized policies prohibiting disability discrimination and requiring its component courts to appoint ADA coordinators, adopt grievance procedures, and develop processes for requesting reasonable modifications.[5]  But these generic policies, first enacted in 2014, *see* Pa.R.J.A. 250, 252, without more, are plainly insufficient to stop the discrimination at issue.  *Cf. Buben v. City of Lone Tree*, No. 08-CV-00127, 2010 WL 3894185, at *12 (D. Colo. Sept. 30, 2010) (holding that even where city had general nondiscrimination policy, ADA claim could proceed based on allegations that city should have implemented specific policies and trainings for its police officers addressing interactions with individuals with mental illness).[6]  They failed to prevent the discrimination alleged in Jefferson County and Northumberland County or to stop six other counties from adopting policies that categorically discriminate against individuals with OUD on the basis of their disability.  Under the circumstances, the United States' lawsuit is an appropriate exercise of its enforcement authority under Title II, is consistent with federalism principles, and implements Congress's mandate to prevent and remedy discrimination against people with disabilities.

## B.    The United States Has Sufficiently Pled That It Attempted to Secure Voluntary Compliance Before Filing Suit

The United States does not dispute that it must attempt to secure voluntary compliance before filing suit under Title II of the ADA.  *See* 28 C.F.R. Part 35, Subpart F.  The United States

---

[5] Individuals like Complainants A, B, and C need not follow the UJS's procedures for seeking a reasonable modification where, as here, the challenged policy or practice is facially discriminatory.  That said, staff of both Courts were on notice that Complainants A, B, and C each *did* require relief from these discriminatory policies.  Compl. ¶¶ 21, 28, 31, 42-46.

[6] *See also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72-73 (1986) ("mere existence of a grievance procedure and a . . . general nondiscrimination policy [that] did not address sexual harassment" did not "insulate [employer] from liability" for sex discrimination under Title VII of the Civil Rights Act of 1964).

has, however, complied with this requirement and has alleged so in the Complaint.

The attempt to secure voluntary compliance is a condition precedent to filing suit. Contrary to what the UJS argues, "pleading of conditions precedent is governed by [Federal] Rule [of Civil Procedure] 9(c), not Rule 8(a)." *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 112 (3d Cir. 2014). Rule 9(c) provides that when "pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed."

The United States has alleged just that. Compl. ¶ 60 ("All conditions precedent to the filing of this Complaint have occurred or been performed. *See* 28 C.F.R. Part 35, Subpart F."). This allegation is sufficient to satisfy the requirements of Rule 9(c). *See Hildebrand*, 737 F.3d at 112; *see also Gress v. Freedom Mortg. Corp.*, 386 F. Supp. 3d 455, 467 (M.D. Pa. 2019) (plaintiff's allegation that "[a]ll conditions precedent to all alleged claims for relief have occurred or been performed" was sufficient to satisfy Rule 9(c), citing *Hildebrand*).[7]

The United States also denies the UJS's assertion, made outside of the pleadings, that the United States has not engaged in good faith efforts to resolve the violations identified. Pursuant to 28 C.F.R. Part 35, Subpart F, the United States only filed suit after issuing a Letter of Findings and attempting, without success, to secure the UJS's voluntary compliance.[8]

---

[7] The UJS's reliance on *United States v. Arkansas*, No. 4:10CV00327, 2011 WL 251107 (E.D. Ark. Jan. 24, 2011), is unpersuasive. The *Arkansas* court incorrectly applied Rule 8(a) instead of Rule 9(c). *Id.* at *12. It also dismissed the United States' complaint without prejudice because the United States had "not made allegations in the complaint sufficient to indicate that it [had] complied with the statutory prerequisites to suit." *Id.* at *22. Here, the United States has alleged compliance.

[8] Without conceding that such materials should be considered, the letters that the UJS attached to its motion support that the United States attempted to conciliate. The United States' February 2, 2022 letter to the UJS stated the United States' position that significant corrective measures were needed to address the discrimination identified. Def.'s Mot. to Dismiss, Ex. C 7-8. The UJS's response on February 23, 2022 stated the UJS's position that "there is no basis for injunctive relief." *Id.*, Ex. D 1.

## C.    The United States' Claim Is Not Time Barred

The UJS's attempts to defeat compensatory relief sought for two individuals, Complainants A and B, are based on an incorrect statute of limitations and an incorrect measure of when that limitation begins to run.[9]

First, the UJS wrongly contends that the statute of limitations that governs the United States' request for damages is the same statute of limitations that applies to Title II actions brought by private plaintiffs.  Def.'s Br. 23-24.  While Title II gives the United States authority to file suit to vindicate the rights of aggrieved individuals, the United States files suit in its own name, not in the name of those individuals.  *Cf. Smith*, 345 F. Supp. 2d at 489-90 (concluding the United States' Title II suit could proceed, even as the individual plaintiff's federal claims were dismissed).  Accordingly, the correct statute of limitations is the one expressly codified by Congress as applying to suits for damages brought by the United States.  *See* 28 U.S.C. § 2415(b) (except in circumstances not present here, "*every* action for money damages brought by the United States . . . founded upon a tort" must be "filed within three years after the right of action first accrues")[10] (emphasis added); *see also, e.g., Garcia v. Brockway*, 526 F.3d 456, 460 (9th Cir. 2008) (citing to 28 U.S.C. § 2415(b)) (noting that actions brought by the Attorney General under the Fair Housing Act seeking damages on behalf of persons who have been

---

[9] The UJS does not assert, nor reasonably could it, that the entirety of the United States' claim is time barred because there is no statute of limitations for equitable relief applicable to actions by the United States under Title II.  *See United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997) ("[A]bsent a clear expression of Congress to the contrary—a statute of limitation does not apply to claims [for equitable relief] brought by the federal government in its sovereign capacity"); *Glenn Elec. Co. Inc. v. Donovan*, 755 F.2d 1028, 1033 (3d Cir. 1985) ("[T]he United States is not bound by any statute of limitation unless Congress explicitly directs otherwise . . . .").

[10] Civil rights actions for monetary damage are, in effect, tort actions.  *See Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("[A]n action brought for compensation by a victim of housing discrimination is, in effect, a tort action").

discriminated against are subject to the general three-year statute of limitations).

Second, the UJS wrongly argues that even if a three-year statute applies, the period of limitations has run. However, the three-year limitation period does not include time during which "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances." 28 U.S.C. § 2416(c). Given this discovery rule explicit in 28 U.S.C. § 2416(c), a determination of when the United States had sufficient knowledge of facts material to the rights of action for Complainants A and B is a fact-based inquiry not suitable for resolution in a motion to dismiss. *See Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) (noting that the statute of limitations is an affirmative defense and may not afford a basis for dismissal under Rule 12(b)(6) unless the bar is "apparent on the face of the complaint"); *see also Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011) (where "the pleading does not reveal when the limitations period began to run . . . the statute of limitations cannot justify Rule 12 dismissal").

The UJS's broader assertion that the United States has failed to allege deliberate indifference on the part of the UJS is also unpersuasive. A showing of deliberate indifference is a "highly fact-specific inquir[y] inappropriately raised at the motion to dismiss stage." *Zavec v. Collins*, No. 3:16-cv-00347, 2017 WL 3189284, at *15 (M.D. Pa. July 27, 2017); *see also Ponzini v. Monroe Cnty.*, No. 3:11-CV-00413, 2015 WL 5123680, at *5 (M.D. Pa. Aug. 31, 2015) ("Deliberate indifference is a standard that requires factual findings . . . ."). The United States' allegations that the UJS component courts categorically prohibit or limit the use of OUD medication by individuals under court supervision in Allegheny, Blair, Butler, Clinton, Delaware, Northumberland, and York Counties, Compl. ¶¶ 33-58, taken as true, on their face support that the UJS acted with, at minimum, deliberate indifference. *See Furgess*, 933 F.3d at

18

292 (to state a claim for damages under the ADA, a claimant must plead deliberate indifference by alleging (1) knowledge that a federally protected right is substantially likely to be violated; and (2) failure to act despite that knowledge).

Here, the UJS knew of the federally protected rights afforded people with disabilities by the ADA, but nonetheless affirmatively acted, through the intentional policies and actions of its component courts, to categorically discriminate against protected individuals with OUD on the basis of their disability. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (holding that "intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom")).

Additionally, the United States anticipates that discovery will reveal additional victims of the UJS's discriminatory conduct and, if appropriate, the United States will seek damages on their behalf.  The Court should therefore refrain from determining or narrowing the scope of individual relief until after liability is decided.  *See Teamsters*, 431 U.S. at 361 ("When the Government seeks individual relief for the victims of [a] discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief.").

### D.    The United States Has Authority to Sue the UJS for Violating Title II

The text, purpose, and legislative history of the ADA all demonstrate that the United States has authority to bring a civil action to enforce Title II.  The UJS's argument to the contrary is simply wrong.  Aside from one reversed district court decision outside this Circuit, all courts to consider this question—including a court in this district and the only Circuit Court to do so—have recognized the United States' authority to sue to enforce Title II.  *See Florida*, 938

F.3d at 1246-48, 1250 (holding that the Attorney General can sue to enforce Title II); *Smith*, 345

F. Supp. at 489-90 (E.D. Pa. 2004) (concluding the United States' Title II suit could proceed,

even as the individual plaintiff's federal claims were dismissed); *see also, e.g.*, *United States v.*

*Mississippi*, No. 16-CV-622-CWR-FKB, 2019 WL 2092569, at *2-3 (S.D. Miss. May 13, 2019)

(holding that the Attorney General has authority to bring lawsuits under Title II), *appeal on other*

*grounds pending*, No. 21-60772 (5th Cir. filed Oct. 6, 2021); *United States v. Harris Cnty.*, No.

4:16-CV-2331, 2017 WL 7692396, at *1 (S.D. Tex. Apr. 26, 2017) ("[T]he plain language of the

ADA, its legislative history, and the implementing regulations clearly establish that the United

States has authority to bring lawsuits under Title II of the ADA."); *United States v. Virginia*, No.

3:12CV59-JAG, 2012 WL 13034148, at *2 (E.D. Va. June 5, 2012) ("[T]he United States has

the authority to initiate legal action to enforce Title II of the ADA."); *United States v. City &*

*Cnty. of Denver*, 927 F. Supp. 1396, 1399-400 (D. Colo. 1996) (finding that the Department of

Justice had met the requirements necessary to bring a Title II claim).

     1.   *The United States Has Title II Enforcement Authority Because the "Remedies,*
         *Procedures, and Rights" Provided to a "Person Alleging Discrimination"*
         *Include the Possibility of the Attorney General Filing Suit*

     Title II provides "persons" alleging discrimination the "remedies, procedures, and rights"

available under Section 505 of the Rehabilitation Act of 1973 and Title VI of the Civil Rights

Act of 1964, and this enforcement scheme includes an administrative process that can culminate

in a lawsuit by the Attorney General.  More specifically, Title II's enforcement section

"provides" any "person alleging discrimination" with "[t]he remedies, procedures, and rights set

forth in [Section 505]."  42 U.S.C. § 12133.  Section 505, in turn, specifies that persons

aggrieved are entitled to the "remedies, procedures, and rights" of Title VI.  29 U.S.C.

§ 794a(a)(2) (citing 42 U.S.C. § 2000d *et seq.*).[11]  Title VI provides that "[c]ompliance" with the statute may be "effected" by (1) terminating financial assistance to violators after an administrative proceeding or (2) "any other means authorized by law."  42 U.S.C. § 2000d-1.

In 1990, when Congress incorporated the enforcement provisions of Title VI and the Rehabilitation Act into Title II, case law and regulations made clear that Title VI and the Rehabilitation Act could be enforced through multiple "other means authorized by law," *id.*, including referral to the Attorney General to bring a civil enforcement action.  *See Florida*, 938 F.3d at 1229-38, 1247-48.  Specifically, regulations issued shortly after Title VI's enactment establish that persons alleging discrimination under that statute may seek relief by filing an administrative complaint, which triggers an administrative process that can culminate in a civil action by the United States to vindicate the rights of affected individuals.[12]  Regulations promulgated in the 1970s to implement the Rehabilitation Act adopt the same enforcement process.[13]  In accordance with these statutory and regulatory provisions, every court to evaluate

---

[11] Section 505 is the enforcement provision for Section 504 of the Rehabilitation Act.  Section 504 prohibits disability discrimination by public and private programs or activities that receive federal financial assistance.  29 U.S.C. § 794(a).  Title VI prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. 42 U.S.C. § 2000d.

[12] These regulations provide that when a person alleging discrimination files an administrative complaint, the relevant federal agency conducts an investigation.  *See, e.g.*, 45 C.F.R. § 80.7(b)-(c) (regulations initially adopted by the U.S. Department of Health, Education, and Welfare (HEW)).  If a federal agency cannot resolve a meritorious complaint informally, it may effect compliance by "any other means authorized by law," including referring the matter to the Attorney General to bring a lawsuit.  *E.g.*, 45 C.F.R. §§ 80.7(d), 80.8(a); *see also* 28 C.F.R. § 50.3(c)(I)(B) (DOJ enforcement guidelines specifying that compliance with Title VI may be obtained by "appropriate court action"); 28 C.F.R. §§ 42.411(a), .412(b) (coordinating Title VI enforcement).

[13] HEW—which was then charged with coordinating the enforcement of the Rehabilitation Act by all federal agencies—issued two regulations pertinent here:  (1) a 1977 regulation specifying that HEW would follow its Title VI regulations when enforcing Section 504 of the Rehabilitation Act, 45 C.F.R. § 84.61; and (2) a 1978 regulation directing other agencies to apply their Title VI

the question before 1990 concluded that the United States may pursue enforcement actions under Title VI and the Rehabilitation Act. *See, e.g.*, *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1050 (5th Cir. 1984); *Nat'l Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569, 575 (D.C. Cir. 1983); *see also Florida*, 938 F.3d at 1231-33, 1236-38 (citing additional cases).

It follows that in 1990, when Congress enacted Title II, it ratified and incorporated into Title II these longstanding administrative and judicial interpretations of the "remedies, procedures, and rights" available to persons alleging discrimination under Title VI and the Rehabilitation Act. *See Florida*, 938 F.3d at 1250 (holding that the "express statutory language in Title II adopts . . . a remedial structure" that may culminate in an Attorney General lawsuit). When "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978); *see also Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); *accord Florida*, 938 F.3d at 1228. That general rule controls here: when Congress chose to "provide[]" any "person alleging discrimination" under Title II with all of the "remedies, procedures, and rights" set forth in Title VI and Section 505, 42 U.S.C.

---

enforcement procedures when enforcing Section 504, 45 C.F.R. § 85.5(a)(1) (1978) (currently codified at 28 C.F.R. § 41.5(a)(1)). HEW's 1977 regulations are especially significant because, as the Supreme Court has recognized, Congress "intended to codify" them when it amended the Rehabilitation Act in 1978 by adding Section 505, which incorporated Title VI's enforcement process. *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 634-35 & nn.15-16 (1984). HEW's 1978 "coordination regulations" are likewise relevant because Congress mandated that Title II's implementing regulations be consistent with them. 42 U.S.C. § 12134(b); *see also Olmstead v. L.C.*, 527 U.S. 581, 591 (1999).

§ 12133, it granted such persons a bundle of well-established remedies and rights, including the right to pursue a federal administrative enforcement process that could culminate in a suit by the Attorney General.[14]  *See also Barnes v. Gorman*, 536 U.S. 181, 189 n.3 (2002) (explaining that "the 'remedies, procedures, and rights'" Title II provides "are the same as the 'remedies, procedures, and rights set forth in'" Title VI and the Rehabilitation Act) (quoting 42 U.S.C. 12133).

This enforcement process fulfills one of Congress's core purposes in enacting the ADA— to "ensure that the Federal Government plays a central role in enforcing the standards established . . . on behalf of individuals with disabilities."[15]  42 U.S.C. § 12101(b)(3).  Indeed, for over 30 years the United States has brought lawsuits and entered into agreements to address Title II violations.

2.   *The Different Language Congress Employed in Titles I and III of the ADA Does Not Alter the United States' Enforcement Authority Under Title II*

The UJS points to references to the Attorney General in the enforcement provisions of Titles I and III of the ADA and mistakenly suggests that because Title II does not also expressly reference the Attorney General, it does not authorize the Attorney General to bring suit.  Def.'s Br. 6.  This difference, however, is readily explained by the fact that, unlike with Title II,

---

[14] Thus, the United States' authority to enforce Title II does not depend on the Attorney General himself being a "person alleging discrimination" under § 12133.  The UJS's reliance on *Return Mail, Inc. v. United States Postal Service*, 139 S. Ct. 1853 (2019), for the proposition that "the sovereign is not a person," Def.'s Br. 6, is therefore beside the point.

[15] Both the House and Senate committee reports accompanying the enactment of the ADA explain that "*the major enforcement sanction* for the Federal government" under Title II "will be *referral of cases* by . . . Federal agencies to the Department of Justice," so that the Department "may then proceed *to file suits in Federal district court*."  H.R. Rep. No. 101-485, pt. 2, at 98 (1990) (emphasis added); S. Rep. No. 101-116, at 57-58 (1989) (same).  Thus, the ADA's legislative history confirms that Congress intended the United States to have a cause of action to enforce Title II.

Congress had to refer to the Attorney General with respect to enforcement of Titles I and III; absent such specificity, Congress could not have conveyed its intention in those titles to grant pertinent authority to particular governmental actors, including the Attorney General. *See Florida*, 938 F.3d at 1228-29 (rejecting Florida's comparison of the three titles' enforcement provisions); *see also United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 742-45 (11th Cir. 2021) (J. Pryor, J., opinion respecting the denial of rehearing *en banc*) (explaining that the differences between Title II, on the one hand, and Titles I and III, on the other hand, do not carry interpretive weight and noting that "with each title of the ADA, Congress was legislating upon a different existing statutory framework").

Title I's enforcement section grants "the [Equal Employment Opportunity] Commission [EEOC], . . . the Attorney General, or . . . any person alleging discrimination" the "powers, remedies, and procedures" set forth in five different provisions of Title VII of the Civil Rights Act of 1964, which establish a complex enforcement regime involving those actors. 42 U.S.C. § 12117(a). To avoid confusion as to whether and how Title VII's division of authority applies to Title I of the ADA, Congress specified the actors among whom the authority was divided. Moreover, Congress was required to refer to the Attorney General and the EEOC in Title I because the statute incorporates not just Title VII's "remedies" and "procedures," but also its "powers," *id.*, a term pertinent only to governmental entities. In Title III of the ADA, Congress gave the Attorney General authority to seek a broad array of relief, including damages and civil penalties—authority that was not fully available under related statutory provisions. 42 U.S.C. § 12188(b); *cf.* 42 U.S.C. §§ 2000a-3(a), 2000a-5(a), 12188(a). Congress could not have granted the Attorney General that expanded authority in Title III without specifically mentioning him.

Title II of the ADA, by contrast, incorporates the "remedies, procedures, and rights" of a

single, existing enforcement scheme established under Title VI and incorporated into the

Rehabilitation Act.  As discussed above, when Congress enacted Title II, the Attorney General's

authority to enforce these two statutes through litigation was well established.  *See Florida*, 938

F.3d at 1250 ("In the other referenced statutes, the Attorney General may sue.  The same is true

here.").  Thus, while Titles I and III of the ADA needed to explicitly reference the Attorney

General, Congress made such authority clear in Title II with a simpler cross-reference.

## VI.    CONCLUSION

For the above reasons, the United States respectfully requests that the Court deny the

UJS's Motion to Dismiss.

Respectfully submitted,

| | |
|---|---|
| JACQUELINE C. ROMERO<br>United States Attorney<br>Eastern District of Pennsylvania | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
| GREGORY B. DAVID<br>Assistant United States Attorney<br>Chief, Civil Division | REBECCA B. BOND<br>Chief |
| CHARLENE KELLER FULLMER<br>Assistant United States Attorney<br>Deputy Chief, Civil Division | */s/ David W. Knight*<br>KEVIN KIJEWSKI<br>Deputy Chief<br>DAVID W. KNIGHT<br>ADAM F. LEWIS |
| MICHAEL BUTLER<br>Special Assistant United States Attorney | Trial Attorneys<br>Disability Rights Section<br>Civil Rights Division |
| */s/ Lauren E. DeBruicker*<br>LAUREN E. DEBRUICKER<br>Assistant United States Attorney<br>United States Attorney's Office<br>Eastern District of Pennsylvania<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA 19106<br>Telephone: 215-861-8492<br>Michael.Butler@usdoj.gov<br>Lauren.DeBruicker@usdoj.gov | U.S. Department of Justice<br>150 M Street NE<br>Washington, D.C.  20530<br>Telephone: 202-307-0663<br>David.Knight@usdoj.gov<br>Adam.Lewis@usdoj.gov<br><br>*Counsel for the United States of America* |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I caused a true and correct copy of the foregoing

Opposition to the Unified Judicial System of Pennsylvania's Motion to Dismiss to be served via

Electronic Case Filing (ECF) upon the following:

Robert J. Krandal, Esq.
Geri R. St. Joseph, Esq.
Supreme Court of Pennsylvania
Administrative Office of Pennsylvania Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102

*Counsel for Defendant*


*/s/ Lauren E. DeBruicker*
LAUREN E. DeBRUICKER
Assistant United States Attorney

Dated: July 1, 2022