IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | CIVIL ACTION |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | NO.  22-709 |
| | : | |
| **UNIFIED JUDICIAL SYSTEM OF THE COMMONWEALTH OF PENNSYLVANIA,** | : | |
| | : | |
| **Defendant.** | : | |

### MEMORANDUM OPINION

**Goldberg, J.**                                                                                                     **April 21, 2023**

The United States, through the Department of Justice ("DOJ"), has sued the Pennsylvania judicial system, known as the Unified Judicial System of Pennsylvania ("UJS"), alleging violations under Title II of the Americans with Disabilities Act ("ADA").  The UJS is the administrative entity that encompasses the entire judiciary of the Commonwealth of Pennsylvania, as well as the Commonwealth's court-related entities**.**  The basis for this lawsuit is that a small number of Pennsylvania county courts[1] have allegedly adopted illegal policies prohibiting individuals with Opioid Use Disorder ("OUD") from taking their prescribed medications while participating in court-operated drug treatment programs, identified in the Complaint as "treatment court programs."  Based on this alleged conduct, the DOJ seeks to hold the entire judicial branch of the Commonwealth of Pennsylvania liable under the ADA, and asks that I order the Pennsylvania Supreme Court to ensure UJS's future compliance with the ADA.

---

[1]     As will be explained below, each separate county in Pennsylvania operates its own trial court known as the Court of Common Pleas.

1

Before me is UJS's motion to dismiss the Complaint in its entirety. UJS argues that it cannot be held responsible for the supervision conditions of criminal offenders that were imposed by judges at the local county level. The UJS also asserts that the DOJ has failed to demonstrate any sort of systemic ADA violation which would trigger UJS's liability as the administrative entity of the entire court system.

While the issues raised would necessarily require me to determine when it is appropriate for a federal court to order the administrative entity of a state judiciary to comply with federal law, I need not resolve that issue at this time because I find that the facts pled are insufficient to state a claim against UJS. Accordingly, and for the reasons that follow, I will grant the motion to dismiss filed by the UJS but will provide the DOJ the opportunity to amend its complaint, if it can re-allege sufficient facts in good faith.

## I.     Factual and Procedural Background[2]

By way of brief background, the UJS was established by the Pennsylvania Constitution and consists of all the state courts in the Commonwealth, including "the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal courts in the City of Philadelphia, [and] such other courts as may be provided by law and justices of the peace." P.A. CONST. art. V, §1. It additionally encompasses various other entities within the state court system, including: the administrative arm of the court system, also known as the Administrative Office of Pennsylvania Courts ("AOPC"); entities responsible for judicial discipline such as the Court of Judicial Discipline and the Judicial Conduct Board; and the Pennsylvania Supreme Court's board committee infrastructure. The Pennsylvania Supreme Court,

---

[2]     At this stage of the litigation, I am required to analyze UJS's motion based upon the facts as pled in the Complaint. When deciding a motion to dismiss for failure to state a claim, I must assume the veracity of all well-pleaded facts found in the complaint. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

as the "highest court in the Commonwealth of Pennsylvania," exercises "general supervisory and administrative authority" over the entire UJS. art. V, §§2, 10(a).

At issue here are the state trial courts within the UJS, which are referred to as "courts of common pleas." art. V, §1. The UJS encompasses sixty local judicial districts in which the courts of common pleas are located, spanning the sixty-seven counties in the Commonwealth. (Compl. at ¶ 7, ECF No. 1.)

The DOJ filed its Complaint on February 24, 2022. As explained above, the DOJ asserts that UJS violated Title II of the Americans with Disabilities Act because a few common pleas courts prohibited or limited individuals with OUD — a form of drug addiction that qualifies as a disability under Title II of the ADA — from taking their prescribed medications while participating in court-supervised treatment programs. 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 35.108(b)(2). The medications at issue — methadone, naltrexone, and buprenorphine — are approved by the Food and Drug Administration to treat OUD. These drugs treat the condition in one of two ways. Methadone and buprenorphine diminish the effects of physical dependency to opioids by activating the same opioid receptors in the brain without producing the euphoric effects. Naltrexone blocks opioid receptors altogether so that a patient taking naltrexone is not able to achieve the rewarding effects of taking prescription or illicit opioids. OUD medication-based treatment may be short or long term depending on a patient's individualized needs, and in some cases, treatment can be indefinite. The risks associated with tapering off these medications include relapse and death. (Compl. at ¶¶ 8–12, 22, 46.)

The DOJ alleges that eight of Pennsylvania's sixty-seven courts of common pleas implemented blanket policies that either severely limited or completely prohibited the use of OUD

medications by participants in their treatment courts. Three individuals who were allegedly harmed by these policies are identified in the Complaint as follows:

Complainants A and B – Jefferson County Court of Common Pleas

On August 3, 2018, a Jefferson County Court of Common Pleas judge issued an administrative order prohibiting all probationers[3] under the Court's supervision from taking any "opiate based treatment medication regardless of whether or not these drugs are prescribed[.]" That judge further ordered that any probationer who was not "completely clean" of such medications within thirty days of the date of their sentence would face probation revocation. The order provided an exception for pregnant probationers. (Id. at ¶¶ 13–15.)

The Complaint alleges that Complainant A had OUD and began treatment with physician-prescribed buprenorphine while on state supervision in 2018. In November of that year, Complainant A's supervision was transferred to Jefferson County. Complainant A's new probation officer advised her that she was subject to the administrative order banning OUD medications and that she would be in violation of her probation if she did not stop taking her medication within thirty days. Complainant A attempted to comply with the order but weaning off her medication caused her significant physical and emotional distress. She "felt nauseous and achy, had trouble getting out of bed, had a reduced appetite, and experienced mood swings that severely strained her personal relationships." (Id. at ¶¶ 18–23.)

Complainant B had OUD and was prescribed buprenorphine prior to being on court-ordered supervision. In September of 2018, Complainant B was criminally charged and entered into Jefferson County Court's Accelerated Rehabilitative Disposition program. Like Complainant A, Complainant B was told she had to stop taking her OUD medication pursuant to the August 3,

---

[3]   The Order specified that it applied to any individual "who [was] sentenced to ARD, Probation, Parole, Intermediate Punishment or Drug Court[.]" (Compl. ¶ 15.)

2018 administrative order. As a result, Complainant B experienced significant withdrawal symptoms, including "insomnia, cramps, abdominal pain, nausea, and vomiting." She required emergency treatment for these withdrawal symptoms on several occasions. Jefferson County Probation eventually referred Complainant B to an inpatient residential treatment program for the express purpose of detoxing her from her OUD medication when her efforts to taper were unsuccessful. She spent more than one month at the facility but did not successfully detox from her medication. (Id. at ¶¶ 25–31.)

On December 21, 2018, the original administrative order prohibiting the use of OUD medication in Jefferson County was rescinded. The rescission occurred approximately four years before the present Complaint was filed, and the order was only in place for four and a half months. (Id. at ¶¶ 24, 32.)

Complainant C – Northumberland County Court of Common Pleas

Complainant C has OUD and has been prescribed buprenorphine since at least 2016. She was admitted to the Northumberland County Drug Court in October of 2016 after pleading guilty to driving under the influence. The Northumberland County Drug Court requires participants to complete three sequential phases of a program that is designed to last eighteen months. The program is overseen by an individual judge of the court of common pleas and a treatment court team comprised of representatives from Northumberland County's Adult Probation and Drug & Alcohol Departments, and a representative from a private provider of treatment services. (Id. at ¶¶ 33–38.)

The judge presiding in drug court and the treatment court team were concerned about Complainant C's use of buprenorphine and actively took steps to taper her off her medication. This included sending her to an in-patient rehabilitation facility to be detoxed from buprenorphine,

as well as referring her to an abstinence-based intensive outpatient treatment provider. The treatment court team repeatedly directed Complainant C not to take her medication despite her doctor's warnings that this could result in relapse or death. Complainant C's progressive steps in the drug court program were significantly delayed due to her struggles to fully comply with the court's orders. As a result of her continuing attempts to taper off her buprenorphine, Complainant C experienced "significant emotional distress and severe side effects . . . including loss of appetite and energy, body aches, soreness, backpain, diarrhea, depression, and anxiety." (Id. at ¶¶ 39–47.)

Complainant C ultimately graduated the program after four years. Unlike Jefferson County, Northumberland County did not have a written policy or administrative order in place regarding the use of OUD medication while participating in court-supervised treatment programs. (Id. at ¶¶ 48–50.)

Other Pennsylvania Treatment Court Programs Described in the DOJ Complaint

The DOJ additionally alleges that five other counties within the UJS have policies that limit or prohibit the use of OUD medication by participants in their treatment courts. A sixth county is also referenced, but as noted below, the Complaint clearly states that this policy was rescinded approximately nine months before the Complaint was filed. These policies are:

- The Allegheny County Court of Common Pleas Mental Health Court program requires court approval for OUD medication and grants this permission "only on rare occasions." The court's policy further states that "[i]f a regularly prescribing physician feels that a client needs to be on any prohibited prescription continuously to sustain a certain quality of life, then the client may not be acceptable to participate in the Mental Health Court Program."

- The Blair County Court of Common Pleas categorically prohibits all participants in its treatment courts from taking any OUD medication other than naltrexone.

- The Butler County Court of Common Pleas Drug Treatment Court had a policy forbidding the use of methadone or Suboxone for participants in the program. This policy was rescinded in June of 2021.

6

- The Clinton County Court of Common Pleas' three treatment courts "restrict participants from getting OUD medication outside of that small rural county."

- The Delaware County Court of Common Pleas has a policy on its website prohibiting the use of "maintenance drugs in any form such as Vivitrol, Subutex, Suboxone, methadone, buprenorphine, and naltrexone" for participants in its three treatment courts.

- The York County Court of Common Pleas has a policy on its website banning the use of methadone and suboxone in its DUI and Mental Health courts.

(Id. at ¶¶ 51–58.)

Based on these allegations, the DOJ brings a single claim of discrimination against the UJS based on disability in violation of Title II of the ADA. In addition to seeking declaratory relief, the DOJ seeks compensatory damages on behalf of the complainants as well as prospective injunctive relief in the form of an order requiring UJS to take various steps to achieve compliance with Title II in the future.

## II.  Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.

The Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard. Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014). First, the court outlines the elements a plaintiff must plead to state a claim for relief. Id. at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." Id. Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" Id., quoting Iqbal, 556 U.S. at 679. The last step is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id., quoting Iqbal, 556 U.S. at 679.

### III.   Discussion

The UJS raises several grounds for dismissal including standing, Eleventh Amendment immunity, prerequisites to suit, and the statute of limitations. The UJS also argues more generally that as an entity overseeing the entire Pennsylvania court system, it cannot be held responsible for a handful of isolated incidents that occurred at the local level of individual courts of common pleas, and that the DOJ's component-courts theory of systemwide liability is not cognizable under Third Circuit precedent. The DOJ responds that the UJS is a unified system, and its component courts are under the centralized administrative and supervisory authority of the Pennsylvania Supreme Court. According to the DOJ, because the Pennsylvania Supreme Court has the power to prescribe and modify rules governing the administration of treatment courts, the UJS is capable of providing the relief sought and is therefore the proper party to be sued.

### A. The Allegations as to Complainant C in Northumberland County Are Insufficient Under Applicable Third Circuit Precedent

While court-related administrative entities often have systemwide oversight responsibilities, they cannot be held liable for judicial decision-making in individual cases. Geness v. Admin. Office of Pennsylvania Courts, 974 F.3d 263 (3d Cir. 2020). In Geness, a prisoner plaintiff sued the Administrative Office of Pennsylvania Courts ("AOPC")[4] after he languished in jail for nearly a decade without being afforded a trial. Id. at 267–68. The plaintiff was initially detained on homicide charges and deemed incompetent to stand trial due to a permanent mental disability. Id. It was alleged that, despite their knowledge of his incompetency status, the lawyers and multiple judges who presided over his case "acquiesced to the repeated continuance of his trial" for approximately nine years until the Commonwealth eventually dropped the charges and he was released. Id. Plaintiff brought a Title II claim against the AOPC, alleging that it discriminated against him because of his mental disability by failing to take any action "designed to provide [him] with his right to be brought to trial on the charges he faced." Id. at 275. Citing sovereign immunity, the AOPC sought dismissal of plaintiff's complaint. Id.

In the process of analyzing the AOPC's Eleventh Amendment immunity challenge to the plaintiff's claims, the Third Circuit discussed the requisite allegations for a Title II claim. To properly plead a Title II claim, the complaint must allege that: "(1) [the plaintiff] is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." Id. at 273. The Third Circuit focused on the third element — identifying the "service[], program[], or activit[y]" the AOPC allegedly denied plaintiff — in determining whether plaintiff's claim was cognizable. Id. at 275. The court concluded that

---

[4]   The AOPC is "the administrative arm of the court system [in Pennsylvania]." (Def. Mot. p. 8.)

the plaintiff was not able to identify a "service, program, or activity" that was denied to him by the AOPC. Id.

In reaching this conclusion, the Third Circuit first noted that the AOPC's liability under Title II could not be premised on judicial decision-making, as none of the rules establishing its duties tasked the AOPC with "policing potential civil rights violations in particular cases." Id. at 277. The court stressed that such a requirement would impermissibly render the AOPC "a judicial back-seat driver." Id. Because the AOPC's liability could not be based on "a duty to meddle with judicial decision-making[,]" the plaintiff was required to identify a different "service, program, or activity" that the AOPC should have but did not provide to him. Id. at 275.

In attempting to identify a "service, program, or activity," the plaintiff argued that the AOPC should have either: (1) intervened with the state court directly to ensure that his case moved forward; or (2) sought intervention for such a result by the Pennsylvania Supreme Court. Id. at 276. But the plaintiff admitted that the AOPC had in fact "repeatedly" inquired about the length and status of his detention to the court's administrator. Id. Regarding intervention from the Pennsylvania Supreme Court, the Third Circuit noted that such action would essentially require the AOPC to "closely monitor, deeply evaluate, and consider intervening in every criminal case pending in the Commonwealth." Id. at 278. And even if the AOPC had intervened, it still did not have the power to hold a criminal trial for the plaintiff, and "it remained the exclusive power of the courts to actually do something about it." Id. The Third Circuit ultimately concluded that because the plaintiff could not identify a service that he was denied that the AOPC could have provided, he did not sufficiently allege a Title II claim, and his claim was properly dismissed. Id.

Here, the DOJ attempts to distinguish Geness by focusing on the relevant administrative entity's ability to provide the relief sought. In Geness, the AOPC ultimately could not provide the

10

relief the plaintiff was seeking because it did not have the power to order that a trial be held. The DOJ presses that the UJS can provide relief in this case because the UJS "has the power to ensure that individuals with OUD are not, as a matter of blanket administrative policy, denied their legally prescribed medication as a condition of participation." (Pl. Br. p. 12). The DOJ attempts to clarify that it "is not challenging or seeking to interfere with appropriate exercises of judicial discretion in individual cases[.]" (Id. p. 11). "Rather, the United States is challenging blanket administrative restrictions that local courts have imposed on the use of OUD treatment medication regardless of the individual circumstances or treatment needs of specific probationers." (Id. p. 12). A careful reading of the Complaint belies this contention.

First, as to Complainant C, who was subject to an individual judge's order, Geness precludes the DOJ's claim because the decision to prevent Complainant C from taking her medication was an exercise of judicial discretion by an individual judge and was not made pursuant to a blanket administrative policy. While the procedural posture in Geness was slightly different in that the plaintiff sued the AOPC rather than the UJS, the general concerns about premising an administrative entity's liability on judicial decision-making are equally applicable to the UJS. Geness, 974 F.3d at n. 12. ("AOPC's administrative functions and the independent role of the judiciary must not be conflated."); Figueroa v. Blackburn, 208 F.3d 435, 440 (3d Cir. 2000) ("The doctrine of judicial immunity is founded upon the premise that a judge, in performing his or her judicial duties, should be free to act upon his or her convictions without threat of suit for damages.").

The allegations as to Complainant C illustrate the type of judicial decision-making with which the UJS does not have the authority to interfere. As a participant in Northumberland County's drug court program, Complainant C was under the supervision of a judge who presided

over a treatment court team. The Complaint does not allege that Northumberland County had a written policy limiting or prohibiting the use of OUD medications for its participants, and counsel for the DOJ confirmed at oral argument that no such written policy ever existed in Northumberland County.[5]

The Complaint states that Complainant C was directed to stop taking her OUD medication not pursuant to a policy, but rather because "[the judge] and the Treatment Court Team were concerned about [her] use of buprenorphine[.]" (Compl. ¶ 42.) Based on my review of the Complaint, this decision was made on an individualized basis and the UJS could not have been on notice of it unless it was "closely monitor[ing]. . . every criminal case pending in the Commonwealth." Geness, 974 F.3d at 278. Because the allegations regarding Complainant C ultimately challenge judicial decision-making rather than failures in court administration practices, they must be dismissed under Geness.[6]

---

[5] [DOJ Counsel]: "[O]ften times, a policy can be in the form of an action. So for example, there's no written policy in Northumberland County, but we have alleged that a policy was applied to Complainant's (sic) C, and that likely was applied to other individuals under court supervision in Northumberland as well."

(Hr'g Tr. 16:24–17:4, June 2, 2022; ECF No. 16).

[6] I also note that counsel for the DOJ acknowledged during oral argument that this kind of individualized assessment would not violate the ADA in the first place:

> THE COURT: [A]s a sentencing judge who has to provide rehabilitation services to persons under my supervised release, I often – quite often defer to probation. And when I have someone who has a drug problem, probation has specialists . . . And I can assure you that there are instances where I defer to them, drug and alcohol treatment at the discretion of probation, and they determine that opioid addiction medication is not appropriate. Have I violated the Disabilities Act?
> . . .
> [DOJ Counsel]: No. Your Honor, what you've done there is exactly what the ADA expects, which is an individualized assessment based on the individual person, their disability, and the situation. But what the ADA does not allow is a blanket banning of treatment for individuals with disabilities across the system with no individualized assessment.

(Hr'g Tr. 14:24–15:16, June 2, 2022; ECF No. 16).

I recognize that Complainant C is just one of several individuals the DOJ has identified as having been harmed by UJS's conduct, and the allegations specific to her cannot be analyzed in a vacuum. But for the reasons that follow, other deficiencies exist in the Complaint that, taken as a whole, require dismissal of the DOJ's claims as they are currently pled.

### B. The Allegations as to Complainants A and B in Jefferson County Alone Are Insufficient to Support a Claim Against the Entire Unified Judicial System

I next address the allegations as to Complainants A and B in Jefferson County. The DOJ alleges that these individuals were subjected to the administrative order prohibiting all probationers under the court's supervision from taking any OUD medications. There are two reasons why these allegations are insufficient to state a claim under the ADA.

First, the Complaint alleges that the administrative order was rescinded on December 21, 2018. (Compl. ¶ 24.) The Complaint was filed approximately four years later on February 24, 2022. (Id.) Because there does not appear to be a policy presently in place, the DOJ does not have standing to seek prospective injunctive relief in the form of an order requiring the UJS's future compliance with the ADA based on these allegations.

A plaintiff seeking prospective injunctive relief must demonstrate an immediate threat of future injury. City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); Doe v. Div. of Youth & Fam. Servs., 148 F. Supp. 2d 462, 479 (D.N.J. 2001). "Allegations of exposure to illegal conduct in the past alone, without a showing of continuing adverse effects, do not demonstrate a case or controversy entitling a plaintiff to prospective injunctive relief." Doe, 148 F. Supp. at 479. The DOJ's acknowledgment that the order was rescinded well before the Complaint was filed

establishes that presently there is no concrete threat of alleged future injury for participants in Jefferson County's treatment courts.[7]

Even assuming these allegations are sufficient to support a claim for damages,[8] they still only involve two participants in one treatment court in one of Pennsylvania's sixty-seven counties. And as I explain below, the DOJ's allegations as to the remaining six common pleas courts are too vague to state a claim. The DOJ does not identify a standard for when a judicial system may be held liable for the acts of its component courts. But even assuming such a standard exists, the facts alleged consist of misconduct by a single court of common pleas.

### C. The Nonspecific Allegations Regarding the Remaining Pennsylvania Common Pleas Courts Are Too Vague and Do Not Sufficiently Allege Harm

The DOJ's Complaint also includes allegations as to six other Pennsylvania courts — Allegheny, Blair, Butler, Clinton, Delaware, and York — which all had/have similar restrictions. These allegations provide little pleading details beyond the types of medication allegedly restricted in each county, and in some instances, the source where the policy can be found (i.e., on the court's

---

[7] These standing concerns apply to any allegations in the Complaint that involve administrative orders or policies that the DOJ acknowledges were rescinded or revoked before the Complaint was filed. (Compl. ¶ 55) ("The Butler County Court of Common Pleas Drug Treatment Court, *until June 2021*, stated in its publicly-available policy manual that it did not allow the use of methadone or Suboxone while in the program.") (emphasis added).

[8] The UJS argues in its motion that any request for damages based on the Jefferson County allegations is time-barred. The applicable statute of limitations for a tort claim in which the government seeks monetary damages is three years under 28 U.S.C. § 2415(b). However, the three-year period specifically excludes time during which "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act." 28 U.S.C. § 2416(c). A determination of when the DOJ became aware of the facts material to Complainants A and B's cause of action is a factual inquiry that is not appropriate for resolution at the motion to dismiss stage. Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 968 (3d Cir. 2011) (the statute of limitations does not justify Rule 12(b) dismissal where "the pleading does not reveal when the limitations period began to run").

website). Importantly, the DOJ does not identify any individuals who were harmed by the alleged policies in these six counties.

These allegations are not specific enough to plausibly state a claim. The ADA provides that "no qualified *individual* with a disability shall, by reason of such disability, be . . . subjected to discrimination . . . by [a public] entity[.]" § 12132 (emphasis added). But the Complaint does not identify a single individual who was harmed by the policies in these counties. Rather, it simply lists, in a conclusory fashion, six additional counties and sets forth in a few sentences the specific drugs that each court either limits or prohibits in its programs. "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." Connelly v. Lane Const. Corp., 809 F.3d 780, 786 (3d Cir. 2016) (internal quotations and citations omitted). Without more information, it is unclear whether the alleged policies in these six counties actually affected anyone at all. The conclusory claim that improper policies once existed and may or may not still currently exist, without any details as to who suffered what harm as a result, does not demonstrate more than a "sheer possibility" that UJS acted unlawfully.

## IV.    Conclusion

In sum, the DOJ's Complaint as currently pled fails to state a claim against UJS. The allegations regarding Complainant C are defective under Geness because individual judicial decision-making was the source of the alleged harm, rather than a blanket policy. Regarding Complainants A and B in Jefferson County, those requests for prospective injunctive relief are insufficient due to lack of standing because the policy prohibiting OUD medication was rescinded before the Complaint was filed. While the DOJ may be entitled to damages for the time period between enactment and recission, the allegations as presently pled against the Unified Judicial

System of Pennsylvania as an entity are deficient. And lastly, the allegations as to the remaining six counties are insufficiently pled under Iqbal and Twombly because the DOJ has not identified any individuals who were harmed by those alleged policies.

    I will provide the DOJ an opportunity to amend its Complaint to attempt to cure the deficiencies outlined in this Opinion, if it can do so in good faith.

    An appropriate Order follows.