IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

THE UNIFIED JUDICIAL SYSTEM OF
PENNSYLVANIA, THE SUPREME
COURT OF PENNSYLVANIA, THE
BLAIR COUNTY COURT OF COMMON
PLEAS, THE LACKAWANNA COUNTY
COURT OF COMMON PLEAS, THE
JEFFERSON COUNTY COURT OF
COMMON PLEAS, and THE
NORTHUMBERLAND COUNTY COURT
OF COMMON PLEAS,

    Defendants.

CIVIL NO. 22-cv-00709

## AMENDED COMPLAINT

Plaintiff, United States of America, respectfully alleges:

1.    The United States brings this suit against Defendants, the Unified Judicial System of Pennsylvania (UJS), the Supreme Court of Pennsylvania, the Blair County Court of Common Pleas, the Lackawanna County Court of Common Pleas, the Jefferson County Court of Common Pleas, and the Northumberland County Court of Common Pleas, to enforce Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134, as amended, and its implementing regulation, 28 C.F.R. pt. 35.

2.    Defendants supervise, administer, and/or operate court supervision programs, including probation, parole, and treatment court programs.  The last of these, also referred to as

"problem-solving courts," are designed to supervise the treatment and rehabilitation of people charged with nonviolent offenses. They focus on specific types of behaviors or conditions often linked to criminal justice involvement, including drug addiction, and provide participants with counseling, treatment, educational assistance, and healthcare support. If a participant completes one of these treatment court programs, they may have the charges against them dismissed, their term of supervision reduced, and/or their criminal record expunged. If a participant fails to complete the program, they may be incarcerated, returned to regular supervision, or otherwise sanctioned.

3.      The United States brings this action to vindicate the rights of individuals with opioid use disorder (OUD) who have been subjected to discriminatory written and unwritten blanket administrative policies and practices in at least eleven UJS Courts categorically restricting their ability to take medication administered by their health care providers to treat their disability.

4.      Defendants have imposed these policies and practices on people with OUD regardless of their individual circumstances or prior conduct, directing them to stop taking their OUD medication (or restricting its use) as a condition of probation and parole supervision or as a requirement to participate or advance in treatment court programs. In so doing, Defendants have put these individuals to an untenable choice: take their medication and face incarceration or termination from their treatment court program, or forgo their medication and suffer painful withdrawal symptoms while risking relapse, overdose, and death. Defendants, through their categorical policies, have thereby denied individuals with OUD an equal opportunity to participate in and benefit from Pennsylvania's court supervision programs in violation of the ADA and have caused them significant harm.

2

5.      Defendants UJS and Supreme Court of Pennsylvania have the power—and the obligation—to prevent these categorical exclusions and to promulgate rules, procedures, or policies that accommodate, rather than discriminate against, people with OUD.  Their failure to take these steps, and the discriminatory rules, policies and procedures adopted by courts within their system, including the Blair County Court of Common Pleas, the Lackawanna County Court of Common Pleas, the Jefferson County Court of Common Pleas, and the Northumberland County Court of Common Pleas, as well as other Pennsylvania Courts, have injured, continue to injure, and place at imminent risk of injury specific identified individuals and a significant number of other individuals who have OUD.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action under Title II of the ADA, 42 U.S.C. § 12133, and 28 U.S.C. §§ 1331 and 1345.

7.      The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 12133.

8.      The United States has authority to seek a remedy for violations of Title II of the ADA.  42 U.S.C. § 12133; 28 C.F.R. pt. 35, subpt. F.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because Defendant UJS resides in this district, all defendants reside in the Commonwealth of Pennsylvania, and a substantial part of the events giving rise to this action occurred in this district.

## PARTIES

10.      Plaintiff is the United States of America.

11.     Defendant UJS is established by the Constitution of Pennsylvania and consists of all the state courts and judges in the Commonwealth of Pennsylvania including "the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal courts in the City of Philadelphia, [and] such other courts as may be provided by law and justices of the peace."  Pa. Const. art. V, § 1.  Each County Court of Common Pleas is a component court of the UJS.  As the state court system of Pennsylvania, the UJS is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104 and is therefore subject to Title II of the ADA and its implementing regulation.

12.     Defendant Supreme Court of Pennsylvania is "the highest court in the Commonwealth of Pennsylvania," and exercises "general supervisory and administrative authority" over the entire UJS.  Pa. Const. art. V, §§ 2, 10(a); 42 Pa.C.S. § 1701.  This includes the power to prescribe and modify rules governing "the administration of all courts."  Pa. Const. art. V, § 10(a); 42 Pa.C.S. § 1722.  Any local rule—including "every rule, administrative order, regulation, directive, policy, custom, usage, form, or order of general application, however labeled or promulgated"—cannot be "inconsistent with any . . . rule of the Supreme Court." Pa.R.J.A. 103(c)(1)-(2); *see also* 42 Pa.C.S. §§ 323, 1722.  This includes "local rules for the administration of problem-solving courts and their related treatment services"—the primary courts and services at issue here.  42 Pa.C.S. § 916(a).  The Supreme Court of Pennsylvania thus has the authority to dictate what problem-solving courts can and cannot require as eligibility criteria for their programs, regardless of whether the problem-solving courts implement the criteria through administrative orders, directives, policies, or any other means.  The Supreme Court of Pennsylvania is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104 and is therefore subject to Title II of the ADA and its implementing regulation.

13.     Defendant Blair County Court of Common Pleas is a public entity within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104 and is therefore subject to Title II of the ADA and its implementing regulation.

14.     Defendant Lackawanna County Court of Common Pleas is a public entity within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104 and is therefore subject to Title II of the ADA and its implementing regulation.

15.     Defendant Jefferson County Court of Common Pleas is a public entity within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104 and is therefore subject to Title II of the ADA and its implementing regulation.

16.     Defendant Northumberland County Court of Common Pleas is a public entity within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104 and is therefore subject to Title II of the ADA and its implementing regulation.

17.     Complainants A, B, C, D, E, and F are qualified individuals with disabilities who are protected by Title II of the ADA because of their OUD.  OUD is a form of drug addiction that causes clinically significant impairment and distress, including health problems, social problems, and a failure to fulfill obligations at work, school, or home.  Complainants' OUD is a physical or mental impairment that substantially limits one or more major life activities.  42 U.S.C. § 12102(1)(A); 28 C.F.R. § 35.108(b)(2) (listing "drug addiction" among other physical and mental impairments).  Complainants are not currently engaging in the illegal use of drugs. 42 U.S.C. § 12210; 28 C.F.R. § 35.131.  All complainants submitted complaints alleging disability discrimination to the United States Department of Justice.  The ADA authorizes the Department of Justice to act for the benefit of those individuals and to sue on its own behalf to

vindicate the interests of other individuals, whether identified in this Complaint or not, who are affected by Defendants' violations of the ADA.

**LEGAL FRAMEWORK**

18.     Title II of the ADA prohibits public entities from administering or operating their programs in a manner that discriminates against individuals with disabilities.  42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

19.     Public entities may not "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(8).

20.     Public entities also may not utilize criteria or methods of administration that (i) have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; or (ii) have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.  *Id.* § 35.130(b)(3).

21.     "The phrase 'criteria or methods of administration' refers to official written policies of the public entity and to the actual practices of the public entity."  28 C.F.R. pt. 35, App. B.

22.     Public entities may impose legitimate safety requirements necessary to safely operate their services, programs, or activities, but only if such requirements "are based on actual

risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.* § 35.130(h).

23.     Through these statutory and regulatory provisions, the ADA seeks to ensure that individuals with disabilities are not denied an equal opportunity to participate in or benefit from the services, programs, and activities of public entities, including state court supervision and treatment court programs.

## FACTS

### A.  The Opioid Crisis and Treatment of Addiction

24.     The opioid epidemic in the United States continues to worsen.  In the 12-month period ending in November 2022, more than 100,000 Americans died of drug overdoses (with opioid overdoses being a leading contributor) and, of those individuals, more than 5,000 died in the Commonwealth of Pennsylvania.  To stem this harm, individuals with opioid addiction have an urgent need for access to effective, evidence-based treatment.

25.     Individuals who use opioids are much more likely to be arrested and to become involved with the criminal justice system.  According to the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration (SAMHSA), the likelihood of criminal justice system involvement increases from 16 percent for those with no opioid use in the past year, to 52 percent for those who have OUD related to misuse of prescription opioids, and 77 percent for those using heroin.  SAMHSA, *Use of Medication-Assisted Treatment for Opioid Use Disorder in Criminal Justice Settings*, 3, 5 (2019).  An estimated 17 percent of state prison inmates and 19 percent of jail inmates report regularly using opioids.  *Id.*  And roughly 30 to 45 percent of inmates report suffering from serious withdrawal

symptoms or an inability to control their use, indicative of severe symptoms of drug dependence.
*Id.*

26.    Methadone, naltrexone (including brand name Vivitrol), and buprenorphine
(including brand names Subutex and Suboxone) are the only medications approved by the U.S.
Food and Drug Administration to treat OUD.  These three medications improve patients' health
and wellness by: blunting or blocking the effects of illicit opioids; reducing or eliminating
cravings to use opioids; and, in the case of methadone and buprenorphine, reducing or
eliminating withdrawal symptoms.  All three may be ordered by medical providers as part of a
comprehensive treatment plan that includes counseling and other behavioral therapies,
sometimes referred to as Medication-Assisted Treatment (MAT).

27.    The three OUD medications are not interchangeable; they have different
pharmacological properties that elicit different responses from different patients.  A medical
provider's decision about which OUD medication is appropriate for a particular patient will
depend on the patient's medical, psychiatric, and substance use histories, their current level of
physical dependence on opioids, their prior responses to medication, their occupation, their
pregnancy status, and their treatment preferences.  To categorically preclude use of one or more
of the medications denies many potential patients access to the only medication that will
effectively treat their OUD.

28.    How long a patient receives OUD medication is tailored to the needs of each
patient and, in some cases, treatment can be indefinite.  According to SAMHSA: "OUD
medication can be taken on a short- or long-term basis, including as part of medically supervised
withdrawal and as maintenance treatment."  SAMHSA, *Treatment Improvement Protocol 63:
Medications for Opioid Use Disorder* at ES-3 (July 2021).  The best results, according to

SAMHSA, "occur when a patient receives medication for as long as it provides a benefit," an approach referred to as "maintenance treatment." *Id.* at 1-8.

29.     SAMHSA cautions that "patients who discontinue OUD medication generally return to illicit opioid use." *Id.* This is because addiction to opioids "is more than physical dependence" and actually "changes the reward circuitry of the brain, affecting cognition, emotions, and behavior." *Id.* If a patient plans to stop use of OUD medication, SAMHSA advises that they and their providers base decisions "on knowledge of the evidence base for the use of these medications, individualized assessments, and an individualized treatment plan they collaboratively develop and agree upon. Arbitrary time limits on the duration of treatment with OUD medication are inadvisable." *Id.*

**B.  The Blair County Court of Common Pleas**

30.     As of 2018, the most recent year for which county-level court supervision data is publicly available, there were 2,699 people under court supervision in Blair County.[1]

31.     On April 30, 2021, the UJS admitted that the Blair County Court of Common Pleas "as a matter of policy limits MAT. That court limits MAT users to [naltrexone]." Under that policy, the Blair County Drug Court did not allow the use of commonly prescribed OUD medications such as methadone or buprenorphine.

32.     At the time the United States filed this civil action on February 24, 2022, that policy remained in place. Blair County Drug Court did not revise its policy until July 1, 2022.

---

[1] *See* PA. BD. OF PROB. AND PAROLE, *County Adult Probation and Parole: Annual Statistical Report 2018*, https://perma.cc/5FKE-5QQ4 (hereafter, CAPP ASR 2018). All further references in this Complaint to county court supervision statistics are taken from this report unless otherwise noted. The supervision type and controlling offenses for those under supervision in Blair County were not reported.

33.    After that date, Blair County Drug Court representatives told participants in the Drug Court that they were allowing OUD medication "against our will," because of this civil action.

34.    Notwithstanding those statements, Blair County Drug Court personnel continue as a matter of policy and practice to favor naltrexone and to pressure all participants to ultimately wean off any OUD medication.  Restricting the use of OUD medications in this manner prevents medical providers from appropriately and effectively tailoring their choice of OUD medication to fit an individual patient's circumstances, including the patient's medical, psychiatric, and substance use histories, prior response to OUD medication, current level of physical dependence on opioids, and other factors.

35.    Blair County's discriminatory policies and practices have harmed Complainants D and E and other individuals under the Court's supervision.

**Complainant D**

36.    Complainant D is an individual with a disability within the meaning of 42 U.S.C. § 12102 because he has OUD, a physical or mental impairment that substantially limits one or more major life activities.  28 C.F.R. § 35.108(b)(2).

37.    Complainant D has a history of drug abuse, including methamphetamine and heroin.  After inpatient treatment to address his addiction, he obtained additional treatment, and that treatment included OUD medication.  Complainant D's use of OUD medication was successful in helping him attain sobriety and stop abusing drugs.

38.    When Complainant D was accepted into Blair County Drug Court in October 2021, he was forced by the Blair County Drug Court, pursuant to its policy prohibiting all OUD medications other than Vivitrol, to wean off his prescribed buprenorphine.

39.     This occurred six months after the UJS informed the United States that it was aware of the Blair County Drug Court's policy banning OUD medications other than Vivitrol.

40.     Complainant D's forced withdrawal from his medication included a stay in inpatient residential treatment, during which he had no appetite, he routinely vomited, his body twitched, and he felt like he wanted to die.  Complainant D spent the Thanksgiving holiday away from his family suffering through this forced withdrawal.

41.     Complainant D has not resumed use of OUD medication because he fears that he may be forced off it again in the future.  Because Complainant D is not taking his prescribed medication, he is at a higher risk of relapse.

**Complainant E**

42.     Complainant E is an individual with a disability within the meaning of 42 U.S.C. § 12102 because he has OUD, a physical or mental impairment that substantially limits one or more major life activities.  28 C.F.R. § 35.108(b)(2).

43.     Complainant E developed an addiction to pain killers after several on-the-job injuries.  When he could no longer get prescriptions, he took pain killers illegally.

44.     In 2018, Complainant E sought treatment for his OUD.  That treatment included a prescription for buprenorphine, as well as regular group and individual therapy.  His treatment was "extremely helpful," and he did not relapse on prescription pain killers.

45.     In 2019, Complainant E pleaded guilty to criminal conspiracy for a drug crime committed before his recovery, and he was accepted into Blair County Drug Court.

46.     Blair County, pursuant to its policy categorically prohibiting the use of OUD medications other than Vivitrol, ordered Complainant E off his prescribed buprenorphine and

sent him to inpatient treatment for the express purpose of weaning him off his prescribed medication.

47.     The medical provider tasked with weaning Complainant E off his medication acknowledged in its records that doing so was not medically appropriate, noting: "Individuals with an opioid use disorder (OUD) tend to have poor outcomes in [drug and alcohol] treatment without access to MAT.  Individuals with an OUD experience a 200% to 600% increase in fatal overdose rates upon discharge from [drug and alcohol] treatment or jail due to rapid relapse to opioids and a lower tolerance to opioids (tolerance can be lowered in <6 days).  MAT increases retention in treatment, reduces relapse rates, and significantly decreases the risk of overdose."

48.     Complainant E described his forced withdrawal as "savage" and "the most terrible thing imaginable."  It lasted several weeks, during which he suffered body aches, nausea, sleeplessness, and depression.

49.     In 2020 and 2021, Complainant E suffered relapses as a direct result of being continuously denied access to his lawfully prescribed medication treatment.  Complainant E's relapses included trying heroin for the first time and becoming addicted.

50.     As a result of Complainant E's relapses, the Blair County Drug Court sent him to jail.  After his release, he was required to complete inpatient treatment, live in a halfway house for an extended period, and complete additional intensive outpatient treatment.

51.     Complainant E's forced withdrawal from medication—which resulted in his relapses, subsequent incarceration, inpatient treatment, halfway house residency, and intensive outpatient treatment—caused him significant financial harm and has significantly extended his time in the Blair County Drug Court.  He has been in the program for almost four years and has

yet to graduate.  Complainant E's incarceration, stints in inpatient treatment, and time in the halfway house also kept him away from his fiancée and young children for extended periods.

### C. The Lackawanna County Court of Common Pleas

52.     As of 2018, there were 3,253 people under court supervision in Lackawanna County.  Of those individuals, 160 were sentenced to intermediate punishment.[2]

53.     The Lackawanna County Treatment Court Programs, administered by the Lackawanna County Court of Common Pleas, are "a comprehensive effort targeting non-violent offenders to combat substance use and its concomitant criminal activity."

54.     The Lackawanna County Court of Common Pleas has a policy of prohibiting use of OUD medication by individuals under Court supervision.

55.     In May 2022, substance abuse treatment providers met with members of the Lackawanna County Court Adult Probation/Parole Department.  The Chief of Probation informed the substance abuse treatment providers that OUD medication was "exchanging one drug for another" and that it would be a violation of an individual's probation or parole to take such medication, thereby admitting that Lackawanna County Court has a policy or practice of categorically banning use of OUD medication by individuals under Court supervision.

56.     Lackawanna County's discriminatory policies and practices have harmed Complainant F and other individuals under the Court's supervision.

---

[2] The controlling offenses for those under supervision in Lackawanna County were not reported. *See* CAPP ASR 2018.

**Complainant F**

57.     Complainant F is an individual with a disability within the meaning of

42 U.S.C. § 12102 because he has OUD, a physical or mental impairment that substantially

limits one or more major life activities.  28 C.F.R. § 35.108(b)(2).

58.     Complainant F has been in treatment for OUD for over a decade, including taking

prescribed buprenorphine.

59.     In 2018, Complainant F was admitted to Lackawanna County DUI Court

following an arrest for driving under the influence (DUI).

60.     In early 2019, Complainant F was incarcerated for one month for an unrelated

probation violation.  While he was incarcerated, Complainant F was not provided his OUD

medication and was instead forced to go through withdrawal from his medication.

61.     Afterwards, Lackawanna County DUI Court did not permit Complainant F to

resume taking his prescribed OUD medication.  The Court took this action pursuant to its policy

prohibiting OUD medication and despite Complainant F's repeated objection to the Court's

interference with his medical treatment.

62.     Fearing relapse, and with no alternative, Complainant F resumed taking his

prescribed buprenorphine.

63.     On August 16, 2019, Complainant F's parole officer, following the Court's policy

banning OUD medication, charged him with a parole violation, alleging: "On July 21st, 2019, the

defendant verbally admitted to taking [S]ubox[o]ne without the consent of the Court. The

defendant also had a [S]ubox[o]ne strip on his person."

64.     Complainant F was incarcerated for one month and spent another month in

inpatient treatment.

14

65.     Complainant F suffered harm as a result of being denied access to his prescribed OUD medication, having his probation revoked, being incarcerated, and being required to complete inpatient treatment.

**D. The Jefferson County Court of Common Pleas**

66.     On August 3, 2018, the Jefferson County Court of Common Pleas issued an administrative order (pictured below) requiring all individuals under the Court's supervision to be "completely clean" of any "opiate based treatment medication regardless of whether or not these drugs are prescribed," within 30 days of being sentenced.  This included individuals sentenced to the Court's Accelerated Rehabilitative Disposition, Probation, Parole, Intermediate Punishment, and Drug Court programs.



**ORDER OF COURT**

AND NOW, this 3rd day of August, 2018, this Court and its probation department dealing with opiate abuse by probationers, and this Court finding that the vast majority (well in excess of 80%) of individuals prescribed with Suboxone, Methadone, Subutex and other opiate based treatment programs, abuse those drugs with regularity; and further that it makes these probationers ineffective and nearly impossible to manage; and finally, it does not appear to help the patients in any way to become productive members of society. It should be noted that among the thousands of individuals who have been on probation while prescribed these drugs, there have been less than 15 people who have successfully completed treatment and been completely weaned off of these drugs.

IT IS HEREBY ORDERED AND DECREED that effective immediately but beginning with this Court's sentencing on August 15, 2018, no individual who is sentenced to ARD, Probation, Parole, Intermediate Punishment or Drug Court shall be permitted to take Suboxone, Subutex, Methadone or any other opiate based treatment medication regardless of whether not these drugs are prescribed, they will be completely clean of the substance with in 30 days of the date of their sentence or face probation revocation.

IT IS FURTHER ORDERED AND DECREED that the only exception shall be pregnant probationers (who are pregnant upon commencement of probation) during pregnancy and with the permission of their obstetrician/gynecologist. These probationers shall be off opiates and free of the substance within 30 days of the end of their pregnancy.

67.     The Court's order impacted many people.  As of 2018, there were 1,188 people under court supervision in Jefferson County[3] and, according to the Court's order, there have been "thousands of individuals who have been on probation while prescribed [Suboxone, Methadone, Subutex and other opiate based treatment medications]."  The only individuals exempted from the Court's prohibition of use of OUD medication were pregnant probationers during their pregnancy.

68.     The Court's administrative order remained in effect for over four and a half months.  While in effect, the order applied to the more than 1,000 individuals under probation and parole supervision in Jefferson County, regardless of their individual circumstances or prior conduct.

69.     On December 21, 2018, the Court rescinded the administrative order without explanation.  The Court gave no indication that it had reconsidered its opposition to OUD medication.  Nor did it take any affirmative action, or adopt any specific policy, demonstrating or affirming that Court staff would not continue as a matter of policy or practice to categorically discourage or prohibit individuals under supervision from taking prescribed OUD medication.

70.     While in place, the Court's administrative order significantly harmed Complainants A and B and impacted other individuals under the Court's supervision.

**Complainant A**

71.     Complainant A is an individual with a disability within the meaning of 42 U.S.C. § 12102 because she has OUD, a physical or mental impairment that substantially limits one or more major life activities.  28 C.F.R. § 35.108(b)(2).

---

[3] *See* CAPP ASR 2018.

72.     In 2018, while under state probation supervision, Complainant A began treatment with physician-prescribed buprenorphine, and views that treatment as essential to her recovery.

73.     In November 2018, the state transferred Complainant A's probation supervision to Jefferson County.

74.     Complainant A's Jefferson County probation officer advised her that she was subject to the Court's administrative order and that she had 30 days—until December 30, 2018—to stop taking her prescribed OUD medication.  If she failed to do so, she would be considered in violation of her probation and sent to jail.

75.     Complainant A met with her doctor and—after discussing the risks associated with tapering off her medication, including relapse and death—she attempted to comply with the Court's administrative order.

76.     Complainant A's attempts to wean off of her OUD medication caused her significant physical and emotional distress.  Complainant A felt nauseous and achy, had trouble getting out of bed, had a reduced appetite, and experienced mood swings that severely strained her personal relationships.

77.     After the Court rescinded its administrative order on December 21, 2018, Complainant A's physician immediately returned her to her previous dosage.  At her next medical appointment, she reported feeling "much improved" with no cravings or withdrawal symptoms.

**Complainant B**

78.     Complainant B is an individual with a disability within the meaning of 42 U.S.C. § 12102 because she has OUD, a physical or mental impairment that substantially limits one or more major life activities.  28 C.F.R. § 35.108(b)(2).

79.     Complainant B was prescribed buprenorphine in 2018 as part of her treatment for OUD, which she says allows her to be a functioning homeowner, parent, and responsible member of society.

80.     In September 2018, facing criminal charges, Complainant B entered the Jefferson County Court's Accelerated Rehabilitative Disposition program, which is designed to keep first time offenders out of jail.

81.     As with Complainant A, Complainant B's Jefferson County probation officer told her that, pursuant to the Court's administrative order, she had to stop using her OUD medication.

82.     Complainant B attempted to comply with the Court's administrative order, which caused her significant emotional distress and significant withdrawal symptoms, including insomnia, cramps, abdominal pain, nausea, and vomiting.

83.     Complainant B required emergency treatment as a result of her withdrawal symptoms on at least one occasion.

84.     When Complainant B's initial efforts to taper were unsuccessful, Jefferson County probation referred her to an inpatient residential treatment program for the express purpose of weaning her off her OUD medication.  She spent more than a month at the facility but was ultimately unable to fully taper.

85.     After the Court rescinded its administrative order on December 21, 2018, Complainant B returned to being treated by a physician with OUD medication and has continued with such treatment.

**E.  The Northumberland County Court of Common Pleas**

86.     As of 2018, there were 1,545 people under court supervision in Northumberland County.  Of those individuals, 335 were under supervision for drug law violations and 226 were

sentenced to intermediate punishment—a sentencing method offering offenders an alternative to incarceration that often includes participation in a treatment court program.

87.     The Northumberland County Drug Court program, administered by the Northumberland County Court of Common Pleas, is one of the County's intermediate punishment programs and provides an alternative to incarceration for individuals with substantial but non-violent and non-sexual criminal histories and "current addiction issues."

88.     Participants must comply with various program requirements.  These include submitting to frequent drug testing, engaging in treatment, and reporting regularly to the Drug Court and to their probation officer.

89.     To graduate from the program, participants must complete three sequential phases, structured to last 18 months.

90.     The Northumberland County Court of Common Pleas operates the Drug Court Program with the assistance of a treatment court team (hereafter, "Treatment Court Team" or "Team").  The Team includes representatives from Northumberland County's Adult Probation and Drug & Alcohol Departments and a representative from a private provider of treatment services.

91.     It has been a policy and practice of the Drug Court, since its inception, to prohibit Drug Court Program participants from taking OUD medication ordered by medical providers.

92.     According to a former Administrator of the County's Drug and Alcohol Program—who helped develop the Drug Court's policies and procedures—the Drug Court banned the use of prescribed OUD medication from the very outset because the goal of the program was to help participants be "drug free" and this included being free of any opiate-based medication like buprenorphine or methadone.

19

93.     Around 2014, the Drug Court began to permit the use of Vivitrol but maintained its ban on buprenorphine and methadone.  Vivitrol requires up to 14 days of opioid abstinence—including from opioid dependence treatments buprenorphine or methadone.  Therefore, it only prevents a return to opioid dependence after a medically supervised opioid withdrawal.  While Vivitrol is a medically appropriate treatment for some individuals with OUD, it is not an appropriate treatment for many patients due their individual circumstances, including their medical, psychiatric, and substance use histories, current level of physical dependence on opioids, and prior responses to medication.

94.     Current members of the Treatment Court Team have admitted that this blanket ban on buprenorphine and methadone was applied to Complainant C when she entered the Drug Court Program.

95.     The Program Coordinator for Northumberland County's Problem-Solving Courts admitted that it was the Drug Court's unwritten policy that participants were not allowed to take or remain on buprenorphine and methadone.

96.     A Northumberland County Probation Officer who was part of the Treatment Court Team assigned to Complainant C similarly admitted that the Drug Court would not allow participants to graduate while still taking buprenorphine or methadone.

97.     The Northumberland County Drug Court's policy prohibiting OUD medication was applied to all individuals regardless of their individual circumstances or prior conduct.

98.     To date, and as further described below, the Northumberland County Drug Court has failed to take sufficient action demonstrating that it does not continue to prohibit or otherwise restrict the use of buprenorphine and methadone.

99.     Northumberland County's discriminatory policies and practices have harmed Complainant C and impacted other individuals under the Court's supervision who participated in, or could have participated in and benefited from, the Drug Court Program.

**Complainant C**

100.     Complainant C is an individual with a disability within the meaning of 42 U.S.C. § 12102 because she has OUD, a physical or mental impairment that substantially limits one or more major life activities.  28 C.F.R. § 35.108(b)(2).

101.     Since at least 2016, Complainant C has been prescribed buprenorphine by a physician as part of her OUD treatment plan.  Buprenorphine has helped her stay stable, enabling her to buy a house, start a small business, and be a better parent to her young child.

102.     Complainant C was admitted to the Northumberland County Drug Court on or about October 2016 after pleading guilty to driving under the influence.

103.     The Court and the Treatment Court Team, including the Program Coordinator and Probation Officer mentioned above, informed Complainant C that to continue or advance in the program she would need to stop taking her prescribed medication.

104.     The Treatment Court Team's requirement that Complainant C stop taking her prescribed buprenorphine was pursuant to the Drug Court Program's administrative policy and practice of categorically prohibiting use of methadone and buprenorphine by any and all participants.

105.     The Team's decision to require Complainant C to stop taking her prescribed buprenorphine was not an individualized decision based on Complainant C's specific condition or prior conduct.

106.    The Team took various steps to force Complainant C to stop taking her
medication.

107.    The Team sent Complainant C to an inpatient treatment rehabilitation facility to
withdraw from buprenorphine.

108.    The Team referred Complainant C to an abstinence-based intensive outpatient
treatment provider that restricted her ability to participate in certain aspects of the provider's
treatment program, like group therapy, because of her use of OUD medication.

109.    In July 2018, Complainant C's Drug Court Case Manager accompanied her to a
medical appointment and informed her doctor that "a condition for advancement in [the] Drug
Treatment court program is that [Complainant C] needs to be off of [buprenorphine]."

110.    Around that same time, the Program Coordinator wrote in Complainant C's
probation log that the probation department had made it clear to Complainant C that even
"when/if" she completed the Drug Court Program and "gets on regular supervision she is not
allowed to take [buprenorphine]."

111.    The Team delayed Complainant C's progression through the successive phases of
Drug Court because of her failure to taper off her medication, even though she otherwise
satisfied the criteria for advancement and graduation.

112.    For more than two years, the Team repeatedly directed Complainant C to stop
using her medication despite being informed by her doctor that Complainant C was doing well
on buprenorphine and that tapering her off of it "could put her at increased risk of relapse,
overdose, and death."

113.    Complainant C made multiple attempts to taper off of her medication to comply
with the Drug Court's policy prohibiting OUD medication and experienced significant emotional

distress and severe side effects as a result, including loss of appetite and energy, body aches, soreness, backpain, diarrhea, depression, and anxiety.

114.    Ultimately, Complainant C stopped trying to taper when her symptoms and opioid cravings increased to the point that she feared she would relapse.

115.    Complainant C was finally permitted to graduate from the Drug Court Program in October 2020, only after the Northumberland County Court of Common Pleas and the Administrative Office of Pennsylvania Courts had been notified that the Department of Justice was investigating the Drug Court Program's compliance with Title II of the ADA.

116.    By the time she graduated, Complainant C had spent four years in what is typically a less-than-two-year program, spending more time in Drug Court than any other participant in the program's history.

117.    While the Northumberland County Drug Court permitted Complainant C to graduate—only after being informed of the Department of Justice's investigation—it has since failed to take sufficient action indicating that it has permanently or irrevocably changed its policies regarding OUD medication.  Indeed, even after Complainant C's graduation, Treatment Court Team personnel offered no assurances that future participants would be permitted to take OUD medication and continued to express the view that OUD medication is at best a short-term treatment that should not be used indefinitely.

**F.  Other Pennsylvania Treatment Court Programs**

118.    Other UJS Courts currently have or recently had written or unwritten administrative policies or practices that categorically prohibit or otherwise limit the use of OUD medication by individuals in treatment court programs, regardless of those individuals'

23

circumstances or prior conduct.  These treatment court programs include drug treatment, mental health, and veterans courts.

119.    Some UJS treatment court policies explicitly ban specific forms of OUD medication.  Others are inconsistent in how they address OUD medication and its use.  Few treatment court programs affirmatively allow such medications.

**Allegheny County Court of Common Pleas**

120.    The Allegheny County Court of Common Pleas' Mental Health Court—whose target service population includes individuals diagnosed with both a mental disorder and substance abuse—generally prohibits the use of OUD medication and makes exceptions to that prohibition "only on rare occasions."

121.    The Mental Health Court's policies, which were provided to the Department of Justice by the UJS, further provide that, "[i]f a regularly prescribing physician feels that a client needs to be on any prohibited prescription continuously to sustain a certain quality of life, then the client may not be acceptable to participate in the Mental Health Court Program."

122.    As of 2018, there were 19,357 individuals under supervision in Allegheny County.  Of those individuals, 2,499 were under supervision for drug law violations and 723 were sentenced to intermediate punishment.

**Berks County Court of Common Pleas**

123.    The Berks County Court of Common Pleas' Drug Treatment Court "prohibits the use of all addictive medications . . . includ[ing] all opiate-based pain medications."  Methadone and buprenorphine are both opiate-based pain medications.

124.    Notably, the policy document setting forth this prohibition, which is publicly posted on the Berks County Court website, states that it was revised in April 2022, after this civil

24

action was filed and after the UJS had already been repeatedly put on notice by the Department of Justice that bans of this nature violated the ADA.  *See* https://perma.cc/86HG-K4D6.

125.    As of 2018, there were 7,055 people under court supervision in Berks County.  Of those individuals, 1,436 were under supervision for drug law violations and 460 were sentenced to intermediate punishment.

### Butler County Court of Common Pleas

126.    The Butler County Court of Common Pleas' Drug Treatment Court, until June 2021, stated in the policy manual posted on its public website that it did not allow the use of methadone or Suboxone while in the program.

127.    As of 2018, there were 3,068 people under court supervision in Butler County. Of those individuals, 386 were under supervision for drug law violations and 517 were sentenced to intermediate punishment.

### Clinton County Court of Common Pleas

128.    The policies for the Clinton County Court of Common Pleas' Treatment Court and Veterans Court, which are posted on the Court's public website, both restrict participants from getting OUD medication outside of that small rural county.  This restriction is not applied to any other medication.  It unnecessarily limits the ability of individuals to get access to OUD medications—which are more tightly regulated and less widely available than average prescription medications—without any medical or scientific basis for doing so.  *See* https://perma.cc/TDV5-KMQS and https://perma.cc/QV9M-UVFF.

129.    As of 2018, there were 959 people under court supervision in Clinton County.  Of those individuals, 172 were under supervision for drug law violations and 110 were sentenced to intermediate punishment.

**Delaware County Court of Common Pleas**

130.    The Delaware County Court of Common Pleas' policies for its three treatment courts, which are posted on the Court's public website, all prohibit use of "[m]aintenance drugs in any form such as Vivitrol, Subutex, Suboxone, Methadone, Buprenorphine, and Naltrexone…."  *See* "Prohibited Medications" lists available here: https://perma.cc/Q8GP-V9W3, *e.g.*, https://perma.cc/278Q-HV3K.

131.    As of 2018, there were 19,458 people under court supervision in Delaware County.  Of those individuals, 2,324 were under supervision for drug law violations and 517 were sentenced to intermediate punishment.

**Luzerne County Court of Common Pleas**

132.    On February 18, 2022, just six days before this lawsuit was filed—and after the Department of Justice had formally put the UJS on notice of its discriminatory policies—the Luzerne County Court of Common Pleas adopted a new set of policies and procedures for its treatment courts under which individuals currently taking a "known, addictive controlled substance" are ineligible to participate.  The Luzerne County Court of Common Pleas classifies buprenorphine and methadone as disqualifying prescriptions under this new policy.

133.    This policy remains in effect and has been cited by the Treatment Court Coordinator as recently as April 2023 as the basis for denying an applicant with another disqualifying medication prescription.

134.    As of 2018, there were 5,240 people under court supervision in Luzerne County.  Of those individuals, 973 were under supervision for drug law violations and 633 were sentenced to intermediate punishment.

**York County Court of Common Pleas**

135.    At the time the United States filed this action, the York County Court of Common Pleas' policies for its DUI and Mental Health Courts, which were posted on the court's public website, banned the use of methadone and Suboxone.

136.    The policy manuals have since been revised and now obscure the issue, saying only that "[c]ertain medications are not allowed while participating in DTC without specific approval by the team and the Court." *See* "Participant Manuals" available here: https://perma.cc/SK5G-AC44, *e.g.*, https://perma.cc/XAS4-R6AT.

137.    As of 2018, there were 10,068 people under court supervision in York County. Of those individuals, 1,493 were under supervision for drug law violations and 960 were sentenced to intermediate punishment.

**G. The Unified Judicial System of Pennsylvania and the Supreme Court of Pennsylvania**

138.    The UJS is obligated by Title II to administer its programs in a manner that avoids discrimination on the basis of disability.  Through the "general supervisory and administrative authority" entrusted to the Supreme Court of Pennsylvania by the Pennsylvania Constitution, the UJS has the power to prescribe and modify administrative policies adopted by UJS Courts of Common Pleas that run afoul of this obligation.

139.    Indeed, the UJS has previously exercised this centralized administrative authority to require all UJS entities to take steps to prevent disability discrimination.  The UJS has required its courts and agencies to maintain certain anti-discrimination policies.  It has required local courts to appoint personnel to implement those policies.  And it has provided resources and accreditation programs to its local courts to aid in this implementation.

140.    Yet, despite having been on notice about the written and unwritten policies of UJS Courts banning or otherwise categorically restricting OUD medication since at least 2018, the UJS and the Supreme Court of Pennsylvania have failed to exercise their oversight authority to end those bans.  The UJS and the Supreme Court of Pennsylvania have not, for example, prescribed or promulgated a general rule preventing UJS Courts from implementing such bans.

141.    The UJS was on notice of Jefferson County's discriminatory ban on OUD medication before December 21, 2018, when counsel for the UJS replied to correspondence with an order vacating the discriminatory ban.  The UJS has failed to take sufficient action to ensure that Jefferson County does not follow a policy of prohibiting or categorically restricting OUD medications.  Jefferson County Court of Common Pleas has likewise not independently disavowed following such a policy.

142.    The UJS was on notice in October 2020 that multiple Northumberland County Treatment Court Team members stated during interviews that it was the policy of the Northumberland County Court of Common Pleas' Drug Court Program to deny access to methadone and buprenorphine.  The UJS was also on notice that those probationary staff held the view that use of methadone and buprenorphine prevented someone from being truly "substance free," as required for graduation.  The UJS has failed to take sufficient action to ensure that Northumberland County does not follow a policy prohibiting or categorically restricting OUD medications.  Northumberland County has likewise not independently disavowed such a policy.

143.    The UJS was on notice of Blair County's discriminatory policy by April 30, 2021, when counsel for the UJS admitted the existence of that policy in a letter.  The UJS took no action to require that Blair County change its discriminatory policy until after the filing of this

lawsuit and, to this day, has failed to take sufficient action to ensure that Blair County does not follow a policy prohibiting or categorically restricting OUD medications.

144.    The UJS was or should have been aware of the other discriminatory policies identified in this Complaint because these facially discriminatory administrative policies were publicly posted, and some of them remain posted, by UJS Courts on their official websites.

145.    To the extent the UJS was not already aware of these discriminatory policies, the United States' Findings and Conclusions letter, sent to the UJS on February 2, 2022, expressly notified the UJS of their existence in at least eight counties.  To this day, the UJS has failed to exercise its authority to ensure the courts identified in the Findings letter, and other UJS Courts, do not follow policies prohibiting or categorically restricting OUD medications or to promulgate a nondiscriminatory OUD medication policy that those courts must follow.

146.    The UJS has failed to appropriately exercise the "general and supervisory administrative authority" entrusted to the Supreme Court of Pennsylvania to ensure that individuals with disabilities are not discriminated against by UJS Courts.  Specifically, the UJS has failed to ensure that individuals with OUD under the supervision of UJS Courts are not denied access to their prescribed disability-related medication.  The UJS has failed to act despite years-long knowledge of these violations and ample indications—through the discriminatory administrative policies posted and enforced by multiple courts and the views expressed by UJS personnel detailed above—that multiple UJS Courts have discriminated and continue to discriminate against individuals with OUD by limiting their access to prescribed OUD medication as a matter of administrative policy and practice.  Indeed, Luzerne County's adoption of a facially discriminatory policy years after the UJS had already been made aware of this

issue—and Luzerne County's continued application of this policy—reveals the inadequacy of the UJS's efforts to address this issue.

147.     The failure of the UJS, the Supreme Court of Pennsylvania, and the individual County Court Defendants to adopt policies or take other steps to prohibit blanket bans and categorical limitations on OUD medication in UJS Court supervision programs has put individuals who take those medications at risk of future injury.  The absence of such policies permits continued discrimination and increases the risk that court personnel may continue to categorically limit access to OUD medication based on their own views—or because they continue to implement prohibitive policies or practices that were previously in place—and provides no assurance to individuals under supervision that prohibitions will not be reinstated later.

148.     No court that has previously prohibited use of OUD medications has publicly and explicitly forsworn such prohibitions, recognized the value of OUD medication, committed itself to nondiscrimination, or provided any other indication that the cessation of the prohibition was anything other than a temporary pause in response to the Department of Justice's investigation and lawsuit.  Without such assurances, individuals who believe—and whose medical providers believe—that they still need OUD medication, may choose, like Complainant D, to stop taking their OUD medication to avoid being forced off of it in the future.  This choice, motivated by fear of the discriminatory categorical prohibitions that have been adopted by UJS Courts, places these individuals at higher risk of relapse, overdose, and death.

**H. Additional Impacted Individuals**

149.     As of 2018, there were 246,995 adults under county court supervision in the Commonwealth of Pennsylvania.[4]  Of those individuals, more than 45,000 were under court supervision for drug law violations and more than 15,000 were sentenced to intermediate punishment.

150.     In Jefferson, Northumberland, Blair, and Lackawanna Counties, where Complainants A, B, C, D, E, and F were harmed, there were more than 8,600 people under court supervision.

151.     In Allegheny, Berks, Butler, Clinton, Delaware, Luzerne, and York Counties, where courts have imposed categorical bans and limitations on access to OUD medication, there were more than 65,000 people under court supervision.

152.     As alleged previously, opioid use greatly increases the likelihood that someone will be arrested and become involved with the criminal justice system.  Given the large number of individuals under court supervision in the Pennsylvania counties identified herein, the significant rate of drug addiction amongst individuals involved with the justice system, and the categorical application of the discriminatory administrative policies at issue, it is highly likely that many other individuals have been impacted by these policies in addition to the individual complainants.  These individuals are identifiable by distinctive characteristics: they have OUD and were receiving or would have benefited from receiving treatment with OUD medication while under court supervision.

153.     Individuals in recovery from OUD who may have been impacted by court policies limiting their access to their prescribed medications are often hesitant to complain about such

---

[4] *See* CAPP ASR 2018.

policies.  Many individuals are not aware that OUD is a protected disability under the ADA in

the first place.  And even those who are aware that their rights are being violated are often

concerned that complaining could expose them to retaliation by the court personnel overseeing

their supervision.

154.    Complainant C, for example, feared that if she complained about being denied

access to her medication she would not be permitted to graduate from Drug Court.

155.    Similarly, Complainants are aware of concerns amongst individuals with OUD

under court supervision that speaking up about discriminatory policies could provoke adverse

consequences.

156.    Upon information and belief, there are many other individuals who have been

affected by the discrimination alleged herein that have not submitted complaints to the

Department of Justice because they are unaware that they have rights under the ADA that have

been violated or because they are concerned about retaliation.

157.    The Department of Justice is authorized to sue on its own behalf to remedy the

harms to individuals who are affected by Defendants' violations of the ADA.

## CAUSES OF ACTION

158.    For each cause of action below, the foregoing paragraphs are incorporated herein.

159.    All conditions precedent to the filing of this Amended Complaint have occurred

or been performed.  *See* 28 C.F.R. pt. 35, subpt. F.

### FIRST CAUSE OF ACTION
### Violation of Title II of the Americans with Disabilities Act by
### Defendant Unified Judicial System of Pennsylvania
### (42 U.S.C. §§ 12131-12134)

160.    Defendant UJS has violated Title II of the ADA, 42 U.S.C. §§ 12131-12134, and

its implementing regulation, 28 C.F.R. pt. 35, in the administration of its court programs by

discriminating against individuals with OUD under court supervision on the basis of disability,
including by:

        a)      Implementing and failing to prevent the implementation of administrative
policies and practices that categorically restrict the ability of qualified individuals with
disabilities, including the individuals identified herein, to take OUD medication
administered by a medical provider, thereby denying them an equal opportunity to
participate in or benefit from UJS services, programs, or activities—including
probationary, parole, and treatment court supervision—in violation of 28 C.F.R.
§ 35.130(a)-(b);

        b)      Imposing or applying and failing to prevent the imposition or application
of unnecessary eligibility criteria that screen out or tend to screen out individuals with
disabilities, including the individuals identified herein, from fully and equally enjoying
UJS services, programs, or activities.  28 C.F.R. § 35.130(b)(8); and

        c)      Utilizing and failing to prevent the utilization of criteria or methods of
administration that: (i) have the effect of subjecting qualified individuals with disabilities,
including the individuals identified herein, to discrimination on the basis of disability;
and (ii) have the purpose or effect of defeating or substantially impairing accomplishment
of the objectives of Defendant's programs with respect to individuals with disabilities.
28 C.F.R. § 35.130(b)(3).

**SECOND CAUSE OF ACTION**
**Violation of Title II of the Americans with Disabilities Act by**
**Defendant Supreme Court of Pennsylvania**
**(42 U.S.C. §§ 12131-12134)**

161.    Defendant Supreme Court of Pennsylvania, because of its "general supervisory and administrative authority" over all of the courts in the UJS and the specific courts identified herein, Pa. Const. art. V, §§ 2, 10(a), is liable for those courts' discriminatory acts and omissions.

162.    More specifically, as alleged in this civil action, Defendant Supreme Court of Pennsylvania has been repeatedly put on notice by the Department of Justice that courts within the UJS have adopted and enforced categorical prohibitions or limitations on the use of medication for OUD, in violation of Title II of the ADA, yet has failed to take sufficient action to proscribe or modify those policies.

163.    Defendant Supreme Court of Pennsylvania through its acts and omissions has thereby violated Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. pt. 35, by discriminating against individuals with OUD under court supervision on the basis of disability, including by:

a)    Failing to prevent UJS Courts under its supervisory and administrative authority from implementing administrative policies and practices that categorically restrict the ability of qualified individuals with disabilities, including the individuals identified herein, to take OUD medication administered by a medical provider, thereby denying them an equal opportunity to participate in or benefit from UJS services, programs, or activities—including probationary, parole, and treatment court supervision—in violation of 28 C.F.R. § 35.130(a)-(b);

b)    Failing to prevent UJS Courts under its supervisory and administrative authority from imposing or applying unnecessary eligibility criteria that screen out or

34

tend to screen out individuals with disabilities, including the individuals identified herein, from fully and equally enjoying any service, program, or activity.  28 C.F.R. § 35.130(b)(8); and

        c)     Failing to prevent UJS Courts under its supervisory and administrative authority from utilizing criteria or methods of administration that: (i) have the effect of subjecting qualified individuals with disabilities, including the individuals identified herein, to discrimination on the basis of disability; and (ii) have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the programs with respect to individuals with disabilities.  28 C.F.R. § 35.130(b)(3).

**THIRD CAUSE OF ACTION**
**Violation of Title II of the Americans with Disabilities Act by**
**Defendant County Courts of Common Pleas**
**(42 U.S.C. §§ 12131-12134)**

164.    Defendants Blair County Court of Common Pleas, Lackawanna County Court of Common Pleas, Jefferson County Court of Common Pleas, and Northumberland County Court of Common Pleas have directly, or through contractual, licensing, or other arrangements, violated Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. pt. 35, by discriminating against individuals with OUD under court supervision on the basis of disability, including by:

        a)     Implementing administrative policies and practices that categorically restrict the ability of qualified individuals with disabilities, including Complainants A, B, C, D, E, and F, to take OUD medication administered by a medical provider, thereby denying them an equal opportunity to participate in or benefit from the Defendant County Courts of Common Pleas' services, programs, or activities—including probationary, parole, and treatment court supervision—in violation of 28 C.F.R. § 35.130(a)-(b);

35

b)      Imposing or applying unnecessary eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying the Defendant County Courts of Common Pleas' services, programs, or activities.  28 C.F.R. § 35.130(b)(8); and

c)      Utilizing criteria or methods of administration that: (i) have the effect of subjecting qualified individuals with disabilities, including Complainants A, B, C, D, E, and F, to discrimination on the basis of disability; and (ii) have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the Defendants County Courts of Common Pleas' programs with respect to individuals with disabilities. 28 C.F.R. § 35.130(b)(3).

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff United States prays that the Court:

A.      Grant judgment in favor of the United States and declare that Defendants have violated Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. pt. 35;

B.      Enjoin Defendants and their agencies, agents, employees, instrumentalities, successors, and all persons in active concert or participation with them from discriminating against individuals with disabilities in their policies or practices, or otherwise violating Title II of the ADA and its implementing regulation;

C.      Require Defendants to adopt or revise their policies to explicitly state, at minimum, that the County Courts of Common Pleas identified herein may not discriminate against, exclude from participation, or deny the benefits of their services, programs, or activities—including probationary and parole supervision, and treatment court programs—to

36

qualified individuals with disabilities because they take OUD medication administered by a medical provider;

D.      Order Defendants to identify one or more employees responsible for monitoring the compliance of the County Courts of Common Pleas detailed herein with the ADA, for training court staff, and for overseeing investigations and resolutions of ADA complaints or grievances;

E.      Order Defendants to update their complaint processes as needed to ensure that ADA-related complaints filed against any County Courts of Common Pleas identified herein are promptly reviewed, investigated, and equitably resolved in compliance with 28 C.F.R. § 35.107;

F.      Order Defendants to, at minimum, train and educate all staff in the County Courts of Common Pleas identified herein about OUD and the nondiscrimination requirements of Title II of the ADA;

G.      Award compensatory damages to the Complainants identified herein and other aggrieved individuals for injuries caused by the ADA violations alleged in this Complaint; and

H.      Order such other appropriate relief as the interests of justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues, pursuant to Federal Rule of Civil Procedure 38.

Dated: May 22, 2023                                    Respectfully submitted,


*/s/ Jacqueline C. Romero*                             */s/ Kristen Clarke*
JACQUELINE C. ROMERO                                   KRISTEN CLARKE
United States Attorney                                 Assistant Attorney General
Eastern District of Pennsylvania                       Civil Rights Division


GREGORY B. DAVID                                       REBECCA B. BOND
Assistant United States Attorney                       Chief
Chief, Civil Division

                                                       */s/ David W. Knight*
CHARLENE KELLER FULLMER                                KEVIN KIJEWSKI
Assistant United States Attorney                       Deputy Chief
Deputy Chief, Civil Division                           DAVID W. KNIGHT
                                                       ADAM F. LEWIS
MICHAEL BUTLER                                         Trial Attorneys
Special Assistant United States Attorney               Disability Rights Section
                                                       Civil Rights Division
*/s/ Lauren DeBruicker*                                U.S. Department of Justice
LAUREN DEBRUICKER                                      150 M Street NE
Assistant United States Attorney                       Washington, D.C.  20530
Deputy Chief for Civil Rights, Civil Division          Telephone: 202-307-0663
United States Attorney's Office                        David.Knight@usdoj.gov
Eastern District of Pennsylvania                       Adam.Lewis@usdoj.gov
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106                                 *Counsel for the United States of America*
Telephone: 215-861-8492
Michael.Butler@usdoj.gov
Lauren.DeBruicker@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this date I caused a true and correct copy of the foregoing

Amended Complaint to be served via Electronic Case Filing (ECF) upon the following:

Robert J. Krandel, Esq.
Geri R. St. Joseph, Esq.
Supreme Court of Pennsylvania
Administrative Office of Pennsylvania Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102

*Counsel for Defendant*
*the United Judicial System of Pennsylvania*


*/s/ Lauren DeBruicker*
LAUREN DeBRUICKER
Assistant United States Attorney

Dated: May 22, 2023